## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **CHRIS PETTIT & ASSOCIATES, P.C.** | § | **LEAD CASE No. 22-50591-CAG** |
| | § | |
| **CHRISTOPHER JOHN PETTIT** | § | **SECOND CASE No. 22-50592-CAG** |
| | § | |
| | § | **Chapter 11** |
| **Jointly Administered Debtors** | § | **(Jointly Administered Under** |
| | § | **Case No. 22-50591)** |

| | | |
|---|---|---|
| **ERIC TERRY, in his capacity as** | § | |
| **CHAPTER 11 TRUSTEE for the** | § | |
| **DEBTORS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **ADVERSARY NO. 24-05031-cag** |
| | § | |
| **TEXAS PARTNERS BANK d/b/a THE** | § | |
| **BANK OF SAN ANTONIO and,** | § | |
| **CHRISTOPHER JOHN PETTIT,** | § | |
| **INDIVIDUALLY,** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff, Eric Terry, as Chapter 11 Trustee ("Plaintiff" or "Trustee") for

the Estate of Chris Pettit & Associates, P.C. and Christopher John Pettit,[1] by and through his

counsel of record, files this First Amended Complaint against Texas Partners Bank d/b/a The Bank

---

[1] All causes of action in this Complaints are asserted by the Trustee in his capacity as Chapter 11 Trustee for the Estate of Chris Pettit & Associates, P.C. In his capacity as Chapter 11 Trustee for the Estate of Christopher John Pettit, the Trustee asserts only the fraudulent transfer claims.

of San Antonio ("TBOSA") and Christopher John Pettit, individually ("Pettit"), and in support thereof would respectfully show the Court as follows:

## I. INTRODUCTION

1.1     This is the devastating story of how the greed and avarice of one man can decimate the hopes, dreams, and generational wealth of those he solicited and stole from with the aid and assistance of financial institutions, specifically Texas Partners Bank d/b/a Texas Bank of San Antonio ("TBOSA"). Pettit's deceit and trickery as an officer and director of his firm, Chris Pettit & Associates, P.C. ("CP&A") and under the guise and artifice of "advisor", "confidant", "counselor", and "friend" to the firm's clients was not only enabled but succeeded by virtue of the blatant disregard of the facts and the law related to the opening and maintenance of accounts and the curtain of respectability extended by TBOSA over and through the accounts – which TBOSA wrongfully opened for Pettit and which enabled the theft of tens of millions of dollars from CP&A and its clients and the enrichment of TBOSA and Pettit along the way.

1.2     CP&A started in 1996 as an ordinary law firm through which the lawyers employed by CP&A practiced, including Pettit. Two decades later, beginning in 2017 Pettit would lay the groundwork with TBOSA for the manipulation of several accounts. These accounts would become the mechanism through which Pettit and TBOSA would steal from those entrusting their money to Pettit and TBOSA. The scheme perpetrated by Pettit and TBOSA resulted in financial gain to both of them and was accomplished through the use and ultimate depletion of the TBOSA Accounts over the course of four (4) years. The actions of Pettit, which were made possible exclusively by TBOSA's willful decision to endorse and profit from the known abuse of the various trust accounts opened by Pettit wreaked financial havoc on CP&A as well as dozens of CP&A clients and 1031 Exchange participants that engaged the services of CP&A. The losses sustained by CP&A and the CP&A clients were made possible because of the abject disregard by

TBOSA of its own internal documentation, existing federal law including nearly every applicable AML/BSA regulation, Texas law regulating lawyer and non-lawyer trust accounts, and the known violations by Pettit of the rules and regulations regarding the opening and use IOLTA accounts and other trust accounts.

1.3     The records, documents, and emails of TBOSA confirm that Pettit could not have carried out his scheme without the knowing assistance of TBOSA. TBOSA logged the account activity in the TBOSA accounts, owned by CP&A and Pettit, and observed in real time that Pettit was misusing the TBOSA accounts to operate a scam on CP&A and CP&A clients. After soliciting Pettit to transfer his accounts to TBOSA, TBOSA stood by, watching every move that Pettit made, and ignored all the telling signs that would serve as notice to TBOSA that Pettit was actively engaged in a horrible plot to steal millions from CP&A and the CP&A clients. These actions included ignoring highly questionable financial documents submitted by Pettit to TBOSA, ignoring hundreds of financial wire transfers that should have stood out as "Red Flags," ignoring numerous over-drafting of accounts that should have stood out as "Red Flags," ignoring numerous wire transfers from accounts that simply didn't have the funds, accepting Pettit's unsensible explanations for issues TBOSA had identified, actively instructing Pettit on ways to disguise reportable events or use work arounds to prevent any eyebrows from being raised while securing more funds. All of these actions were actively engaged in by TBOSA so that TBOSA could financially profit off CP&A and CP&A clients.

## II.  PARTIES

2.1     The Trustee is an individual appointed Chapter 11 Trustee for the Estate of Chris Pettit & Associates, P.C. by the Honorable Craig Gargotta in Cause No. 22-50591, In re Chris Pettit & Associates, P.C., in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

2.2     Defendant, Texas Partners Bank d/b/a The Bank of San Antonio ("TBOSA"), is a state charted financial institution organized under the laws of the State of Texas and doing business in Texas. TBOSA has made an appearance in this case, and therefore may be served with this First Amended Complaint through its counsel of record.

2.3     Defendant, Christopher John Pettit ("Pettit"), is a citizen and resident of the State of Texas.  Christopher John Pettit may be served with process at the Karnes City Detention Facility, 810 Commerce Street, Karnes City Texas 78118 Inmate ID No. WD20498510.

## III.  JURISDICTION AND VENUE

3.1     This Court has jurisdiction of this Adversary Proceeding under 28 U.S.C. §§ 1334 and 157. This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), (K), and (O). The Court has the constitutional authority to enter a final judgment in this matter pursuant to *Stern v. Marshall,* 564 U.S. 462 (2011) and its progeny. Moreover, the Trustee consents to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

3.2     Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409(a) because the Main Case is pending before this Court.

## IV.     FACTUAL BACKGROUND

### A.     Christopher Pettit ("Pettit") is a Disgraced Former Lawyer.

4.1     Pettit graduated from law school and was licensed to practice law in the State of Texas in November 1991.  Pettit began practicing law in San Antonio, Texas and focused his practice in the areas of wills & estates, probate, and personal injury.  Pettit formed CP&A in 1996.

Though Pettit was the sole shareholder of CP&A, Pettit was not the only lawyer employed by CP&A.  CP&A employed at least 20 people including lawyers, paraprofessionals, and office personnel in furtherance of the business of CP&A. CP&A, at all times during the period in question, operated as a separate legal entity, duly formed and authorized to transact business in the State of Texas. Pettit developed a niche market through the hosting of estate planning seminars primarily in Bexar and the surrounding counties focusing his efforts on rural agricultural communities and the burgeoning wealth attendant to the Eagle Ford Shale region of South Texas. As Pettit's reputation grew, the services that were offered through CP&A expanded from traditional legal services to include investing, tax preparation, and 1031 Exchange Agent services. It was through these services that Pettit concocted a fraudulent scheme to harm clients, CP&A, and creditors for years. Pettit finally pleaded guilty to three counts of money laundering and three counts of wire fraud.[2]

4.2    Based upon the proofs of claim filed in the CP&A case, Pettit began his scheme to avail himself of the assets and opportunities of CP&A and the clients of CP&A around 2007, a decade after the formation of CP&A.  Pettit used various community banks in the greater San Antonio metropolitan area to relieve CP&A and many of the dozens of clients that filed proofs of claim in the Pettit and CP&A bankruptcy proceedings of their hard-earned resources.  Pettit opened accounts for CP&A at TBOSA bank (among other banks) to further his scheme to defraud the clients and 1031 Exchange counterparties of CP&A. Pettit used the CP&A funds on deposit at TBOSA to pay his personal debts, including approximately $6 million in loan payments to TBOSA.

---

[2] *See* Press Release, Former San Antonio Lawyer Pleads Guilty to Wire Fraud, Money Laundering (Oct. 6, 2023), https://www.justice.gov/usao-wdtx/pr/former-san-antonio-lawyer-pleads-guilty-wire-fraud-money-laundering#:~:text=Pettit%20pleaded%20guilty%20to%20three,for%20the%20money%20laundering%20counts.

**B.** **TBOSA Enabled Pettit to use TBOSA Accounts to Accomplish His Fraudulent Scheme.**

4.3    On or shortly before April of 2017, TBOSA, by and through its employees, including Brandi Vitier, solicited Pettit to open accounts at TBOSA, to include loans and TBOSA brokerage accounts as collateral for a line of credit that would be provided to Pettit:



-----Original Message-----
From: Brandi Vitier <Brandi.Vitier@thebankofsa.com>
To: petticorn <petticorn@aol.com>
Cc: Monica Castillo <monicacl@pettitlaw.com>; Alma Hayes <Alma.Hayes@thebankofsa.com>
Sent: Mon, Jun 26, 2017 3:51 pm
Subject: Working List - Items needed to Close

Hi Chris & Monica,
Please find the items needed to close the loans. I will commented in RED  on where we are in the process below:

·

·    Receipt, review, and acceptance of a third party appraisal, with the loan amount not to exceed the lesser of $1,700M or 80% of the "as is" appraised value. ( we ordered bids today for the appraisal )

·    Receipt of lease agreements for the subject collateral property, with the lease to be coterminous with the subject request due prior to closing.

·    Bank accepted and approved: Survey, Environmental Questionnaire ( we will send in separate email), Do you have a existing survey on the property?

·    Receipt of insurance policy for the subject property naming the Bank as loss payee. Please send dec page with the Bank as Loss payee

•    Receipt of personal sources and uses statement from Chris Pettit. ( I will send you the one that I made, please review and make changes as necessary)

Chris Pettit & Associates, PC. - a new $3,600M revolving line of credit

·    Receipt of Borrower's organizational documents.

·    Receipt of properly perfected assignment of brokerage account to be held at Bank of San Antonio Wealth Management. If at any time the account falls below the 80% margin agreement, the Borrower will have 10 days to cure the breach.

•    Borrower to open and maintain their primary operating account at TBOSA with the subject request set to auto-debit.

Alma, who I have cc'ed here will be helping me with the closing.

Thank you!
Brandi

4.4     Pettit, through the use of CP&A and the client base of CP&A, held himself and CP&A out as a "qualified intermediary" for "like kind property" exchanges pursuant to Section 1031 of the Internal Revenue Code (hereinafter a "1031 Exchange"). Such 1031 Exchanges have limitations which include strict timing requirements (45 to 180 days), property characteristic limitations (i.e., investment property for investment property), and the mandate that they be undertaken by a qualified exchange agent (a disinterested person, *i.e.*, not your lawyer, accountant, investment banker, broker, or real estate agent).

4.5     Over the years many 1031 Exchanges were undertaken by Pettit through the use of CP&A and depository accounts at TBOSA.

4.6     Pettit opened at least eleven (11) accounts at TBOSA, including personal checking accounts, two IOLTA accounts, an Estate Management account for CP&A, and accounts for Piccoli Properties, Inc. and Oak Hills Financial Group, Inc. which managed Pettit's rental properties, among others and facilitated more than $130 million in deposits across the accounts (the "TBOSA Accounts"). The Estate Management account alone saw more than $34 million in

deposits. With access to such a large cash flow, TBOSA was more than willing and eager to ensure Pettit was a happy customer and turn a blind eye to what was clearly apparent and questionable activity.

4.7     Pettit's activities across the accounts at TBOSA demonstrated many red flags that were known or should have been known by TBOSA, including without limitation (the "Red Flags"):

- More than 75 overdraft occurrences and more than 15 returned items across the TBOSA Accounts, including from the IOLTA and estate management accounts (**Exhibit G** - TBOSA Overdraft and Returned Items);

- Payments to the TBOSA loans from the IOLTA and Estate Management accounts; and

- Teller withdrawals from the Estate Management account.

4.8     There are several instances where checks were returned due to NSF ("Non-Sufficient Funds") in Pettit's various TBOSA Accounts. TBOSA would assist Pettit in clearing the returned checks without any inquiry into the reason for the multiple returned checks or the immediate large, round dollar, hundred-dollar, or thousand-dollar amount cash deposits and fund transfers made by Pettit to permit the returned checks to clear, or any other inquiry into these Red Flag actions on Pettit's TBOSA Accounts:

**From:** CHRIS PETTIT <petticom@aol.com>
**Sent:** Saturday, April 17, 2021 8:00 PM
**To:** petticom@aol.com; Maria Breen <maria.breen@thebankofsa.com>
**Subject:** Re:

**EXTERNAL EMAIL** - Do not open attachments or click links from an unknown source. Report suspicious emails using the "Phish Alert" button.

Dear Maria,
I just received a call that checks that had cleared the IOLTA almost a week ago are now being returned NSF.
Can you tell me what is going on?
Chris
210-332-2868

Sent from my iPhone



4.9    There are numerous instances where TBOSA approved overdrafts on Pettit's various TBOSA trust accounts—*prior to* verifying if Pettit would be able to deposit enough funds to cure the defects—in an effort to avoid any alerts of Red Flags transactions that were obviously noncompliant with TBOSA's internal procedures and federal regulations. Below is one such instance:



**C.      TBOSA participated with and profited from Pettit.**

4.10     On information and belief, TBOSA was a willing participant in the scheme of Pettit to defraud CP&A and the clients of CP&A because Pettit showed great potential for running millions, if not billions, of dollars through the accounts he controlled at TBOSA.

4.11     On information and belief, the relationship with Pettit was fostered by one or more TBOSA employees, including Brandi Vitier and Amanda McChesney among others, because the TBOSA culture financially rewarded those employees based on a number of metrics including the number of accounts opened, the amount of the daily balances in those accounts, and the amount of the deposits that were made to those accounts.

4.12     With a view towards this opportunity, TBOSA pulled out all of the stops to get business from Pettit by contacting Pettit often, offering him tickets to events, lunches, and other perks, offering to meet him at his convenience at his office, scheduling daily morning check-in meetings to discuss any unusual activity on his accounts to cure the issues before the activity prompted notification to any upper management, and often gave Pettit extra assistance by ""push[ing] the easy button" in order to get his business:



4.13    For example, in an email dated April 23, 2020, TBOSA knew that Pettit's accounts were out of the LOC compliance margin and chose to offer Pettit various options to cure this noncompliance rather than report any of the Red Flag actions on Pettit's accounts:



On Apr 23, 2020, at 3:14 PM, Amanda McChesney <Amanda.McChesney@thebankofsa.com> wrote:

Hi Chris,

I apologize for the delay in getting back to you on the LOC margin agreement.  As you know, we've been all-hands on PPP.  The good news is that the market has rebounded and the numbers to cure the out of compliance margin are much smaller now.  Please see options below and let us know how you would like to proceed –

A – additional pledge to get to full LOC availability

B – additional pledge to get back into compliance at the current balance

C – amount to pay down the RLOC to get back into compliance

<image001.png>

If you'd like to discuss further or have any questions, just let me know.

Thanks,

Amanda

4.14    In June of 2018, TBOSA Managing Director Cynthia Michael realized that Pettit's line of credit has reached the maximum allowable balance and immediately offered Pettit some ideas to cure any issues, such as having the President Brandi Vitier make a "quick loan for $400,000.00" and "using the margin on the other trust to make up the difference."  TBOSA offered these alternative options to cure Pettit's defects despite knowing that Pettit's current balance was already past the collateral requirement on his line of credit:



4.15    On information and belief, as a result of the value potential afforded to TBOSA through the account activity of Pettit and CP&A, TBOSA either actively enabled Pettit to breach his fiduciary duties to CP&A and the CP&A clients through the misappropriation of their assets or intentionally looked the other way allowing the fraud and breach of fiduciary duty to occur with apparent impunity.

**D.    TBOSA Is Required to Know its Customers.**

4.16    It is a fundamental tenet of banking that banks are required to know their customers and understand their customers' banking behavior. *See* 31 C.F.R. §§ 1020.220(a)(1) and (2).  This provision is commonly referred to as the "Know Your Customer Rule" (the "KYC Rule").  As a result of the KYC Rule, TBOSA is required to collect information about the holder of each account, including confirmation of the authority of the person opening the account to do so. As part of that

process, when an account is opened with TBOSA its employees are required to obtain information concerning the individuals who control the account along with such other information as may be required to confirm that the signatories to the account are, in fact, authorized to act in the manner proposed through the account. TBOSA maintains publicly that it and each of its employees must comply with applicable all rules, regulations, and company policies, but TBOSA adopted the "Pettit Exception" to their compliance culture.

4.17    TBOSA is also required to develop, administer, and maintain a program to ensure compliance with federal Anti-Money-Laundering ("AML") laws.  The program is to be approved by the bank's board of directors and: (1) provide a system of internal controls to ensure compliance at all times, (2) provide for independent testing of the bank's ongoing compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

**E.    TBOSA Ignored Both the KYC Rule and AML Laws When it Came to Pettit.**

4.18    The federal government established the Federal Financial Institutions Examination Council ("FFIEC") in 1979. TBOSA, and other financial banking institutions, receives guidance from the FFIEC, which is tasked with ensuring consistency in AML compliance efforts across the banking sector. FFIEC publications describe certain "red flags" that indicate money laundering schemes and other misconduct mandating further inquiry. Examples of these suspicious indicia relevant to the banking activities of Pettit at TBOSA include:

a.   "Many funds transfers are sent in large, round dollar, hundred-dollar, or thousand-dollar amounts."

b.   "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

c.   "Unusual use of trust funds in business transactions or other financial activity."

d.   "A large volume of … funds transfers are deposited into … an account when the nature of the accountholder's business would not appear to justify such activity."

e.   "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

f.   "Funds transfers contain limited content and lack related party information."

g.   "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

h.   "Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank."

i.   "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

j.   "Customer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose."

k.   "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."

l.   "Funds are sent or received via international transfers from or to higher-risk locations."[3]

4.19    Below is an instance in April of 2021 of an unusual use of trust funds in business transactions or other financial activity where Pettit requested to transfer funds from a trust account to cover overdrafts in multiple TBOSA Accounts to which TBOSA was aware of and approved without question:

---

[3] **Exhibit A** - FFIEC Red Flags at pp. 1-9.

**From:**   Maria Breen <maria.breen@thebankofsa.com>
**Sent on:** Tuesday, April 20, 2021 6:27:04 PM
**To:**     petticom@aol.com
**Subject:** RE: Re:

Chris,

The transfers have been made and the items we discussed will be paid except for the ACH from American Express as you instructed. This brings the accounts in to a positive position, however, we are beginning to see additional items being presented for payment.  As we've been doing, we will visit in the morning about the activity which could lead to additional overdrafts.

Maria

**From:** petticom@aol.com <petticom@aol.com>
**Sent:** Tuesday, April 20, 2021 9:57 AM
**To:** Maria Breen <maria.breen@thebankofsa.com>
**Subject:** Re:

> **EXTERNAL EMAIL** - Do not open attachments or click links from an unknown source. Report suspicious emails using the "Phish Alert" button.

Dear Maria,

This is to confirm the request to transfer from my sons trust account the amounts of $122,000 to the Expense account, $20,000 to the IOLTA, $20,000 to the Operating, and $10,000 to the personal account.

It is my understanding that will bring all of the accounts to a positive balance.

I thank you for your assistance.

Chris Pettit

4.20     Another instance of TBOSA's knowledge and awareness of an unusual use of trust funds in business transactions or other financial activity concerning Pettit's TBOSA Accounts occurred in July 2018 where TBOSA noticed this unusual activity yet accepted Pettit's convoluted excuses and permitted the activity to continue without penalty or further inquiry:



**From:** petticom@aol.com
**Subject:** Re: Follow Up
**Date:** July 11, 2018 at 7:42 AM
**To:** Amanda.McChesney@thebankofsa.com
**Cc:** Brandi.Vitier@thebankofsa.com

Dear Amanda,

Please find attached the updated case list and internally prepared financials through June 30th 2018.

The previous line of credit was paid out of the IOLTA because it and the current one are used for case expenses rather than firm operating.  When we switched to Bank of San Antonio, the interest payments started being taken from the operating account.  If we could switch that to coming out of IOLTA then it would match what John Buxie has been doing.  If not, I will ask to revise what he is doing.

On the Seagull, I have asked Mitzi to forward to you the General Contractor contract and I have reached out to the carrier for the Assignment of Benefits form.

Thank you for your assistance.

Chris

CONFIDENTIALITY NOTICE
This communication, including attachments, is for the exclusive use of addressee and may contain proprietary, confidential, and/or privileged information.  If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited.  If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this communication, and destroy all copies.

-----Original Message-----
From: Amanda McChesney <Amanda.McChesney@thebankofsa.com>
To: Chris Pettit (petticom@aol.com) <petticom@aol.com>
Cc: Brandi Vitier <Brandi.Vitier@thebankofsa.com>
Sent: Tue, Jul 10, 2018 5:07 pm
Subject: Follow Up

Hi Chris,

Thanks for your time today. As a recap, to help us get ahead of the curve on questions that may arise on the line of credit renewal, can you please send us:

1) Updated financials through April or May on Pettit & Associates

2) Updated case listing

I spoke to Linda and John regarding the line of credit not being on the balance sheet. John said that the reason was that the line of credit was tied to the IOLTA account, and since it was supporting the IOLTA account, it never shows up on the financials. I think we're a little confused as the line doesn't look to be supporting the IOLTA or tied to insurance payments coming in on settlements as that would suggest. Can you help us with this? I'm wondering if perhaps it was set up this way at Frost, but then changed when it was moved over here and perhaps should show up on the balance sheet. If easier to discuss by phone, that'll work too.

4.21    Upon information and belief, consistent with FFIEC guidance, TBOSA is expected to maintain a system of controls sufficient to identify patterns of account activity, particularly activity between TBOSA Accounts, which would necessarily include the transactions between the CP&A accounts, the Estate Management account, and IOLTA accounts.  The substantive nature of the transactions, the relationships between the transacting parties, and the parties' identities can be examined through this system. This process would have necessarily identified the multitude of "red flag" transactions undertaken by Pettit, including those "red flag" transactions which TBOSA personnel actually assisted Pettit.  Pursuant to the FFIEC guidelines, TBOSA is expected to use

external sources of information like the internet, commercial database searches, and direct inquiries to determine the identity of originators and beneficiaries, and/or the nature of suspicious account transactions.

4.22    As required by 31 C.F.R. § 1020.220(a)(1), TBOSA is expected to maintain procedures to identify each customer and to collect information about the holder of each account (as required by 31 C.F.R. § 1020.220(a)(2)). When an entity rather than an individual opens an account, the bank obtains information about the individual who will control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C). The information that TBOSA should collect about new business account clients includes the purpose and nature of the business, anticipated activity in the account (e.g., volume, value (number and dollar), and type of transaction), where the customer expects to transact business, and the products and services commonly used by the customer. In the case of trust accounts, determination of the actual authority of the person attempting to open the account is certainly within the purpose of the KYC rules.  Unquestionably in this category of monitoring would be the cash deposits and withdrawals into the Estate Management Account.

4.23    Under applicable federal regulations, TBOSA is also required to maintain internal controls to ensure ongoing compliance with federal AML law. These internal controls can include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel. These controls also include customer due diligence programs to prevent and detect money laundering. Upon information and belief, through these programs TBOSA can and should obtain information that gives it an understanding of the unique financial activity of its customers. Likewise, TBOSA can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account. This knowledge is then used to identify unusual and suspicious transactions.

4.24    Upon information and belief, TBOSA employees are trained to monitor and understand account activity and TBOSA requires its employees to comply with banking regulations, including basic AML guidelines, as a condition of their employment.

4.25    Upon information and belief, the activities in the TBOSA Accounts, including Pettit's personal accounts, the CP&A accounts, and the Estate Management and IOLTA accounts, began to reflect many common—and actually glaring—signs of money laundering and fraud, all of which TBOSA knowingly assisted and permitted.

4.26    For example, in the April 2021 email chain below, Maria Breen, Private Banking Manager for TBOSA, is informing Mr. Pettit that TBOSA would be returning funds for the items posted in Pettit's operating account to prevent an overdraft.  This email demonstrates TBOSA's and TBOSA's upper management's ongoing *knowledge* of multiple returned checks and *willingness* to actively cover up overdrafts to prevent any "red flags" from being raised. Notably, many of these instances of returned checks are not reflected as "returned items" in the banking activity of the TBOSA Accounts. (*See* **Exhibit G** - TBOSA Overdraft and Returned Items).

---

**From:**   Maria Breen <maria.breen@thebankofsa.com>
**Sent on:** Monday, April 19, 2021 5:34:14 PM
**To:**      petticom@aol.com
**Subject:** RE: Re:

Chris,

I wanted to review the items posting today to the accounts and let you know those we will be paying and those we will be returning.

Personal Account (we will pay these items):
$20.22 ck# 1297
$292.10 ck# 1309
$250.00 ck# 1315

IOLTA (we will pay these items):
$13725.00 ck# 14871
$1000.00 ck# 14942
$2397.60 ck# 15029

Operating Account (we will return these items as they will overdraft the account):
$1152.95 ck# 2179
$1830.00 ck# 2184
$902.82 ck# 2191
$3708.27 ck# 2193
$799.87 ck# 2203
$1353.29 ck# 2206

Maria

---

**F.  TBOSA Failed to Stop Pettit in Favor of TBOSA's Own Financial Gain.**

4.27    Despite these red flags and obvious signs of money laundering and fraud, TBOSA chose not to terminate its relationship with Pettit and instead continued providing banking services to Pettit until approximately July 2021. Upon information and belief, when TBOSA finally ended its banking relationship with Pettit, it was not due to the continuous Red Flag actions that TBOSA was aware of and dismissed, but rather TBOSA resigned as an advisor to Pettit because of the "publicity:"

From:    Christopher Pettit <chrispettit2022@gmail.com>
Sent on: Thursday, September 1, 2022 9:01:54 PM
To:      esther.mckean@akerman.com
Subject: Re: Pettit Trust -

They flat out refuse to provide it.  They claim
That they are no longer the advisor allegedly resigned as the advisor because of the publicity but Fidelity still has them as the advisor.
Fidelity says they can't do anything without the bank initiating it.
Very frustrating.
Thank you,
Chris

On Thu, Sep 1, 2022 at 4:55 PM <esther.mckean@akerman.com> wrote:

ATTORNEY CLIENT PRIVILEGED COMMUNICATION

Chris,

What was Texas Partners Bank reason / justification for not providing the documents?

**Esther McKean**

Akerman LLP | 420 South Orange Avenue, Suite 1200 | Orlando, FL 32801

D: 407 419 8583

esther.mckean@akerman.com

4.28    Even when the end of the client-relationship with Pettit was near, TBOSA continued to fawn after Pettit as a prime client in an effort to avoid losing his business due to the exceedingly large amount of cash flow TBOSA was gaining from its relationship with Pettit:



4.29    In sum, TBOSA failed to stop Pettit in favor of its own financial gain.

4.30    Eric B. Terry was appointed the Chapter 11 Trustee of the Estate of CP&A on June 13, 2022 [ECF No. 39].  On August 10, 2022, Judge Gargotta entered an Order Granting Chapter 11 Trustees' Motion for (I) Turnover of Funds In Debtors' Bank, Brokerage, Investment, Savings and Other Financial Accounts, (II) Turnover of Bank Account And Other Financial Account Information And Documents and (III) Related Relief [ECF 304] (the "Account Disclosure Order"). Following the entry of the Account Disclosure Order, the Trustee obtained possession of the account statements from TBOSA, among other financial institutions. The records reveal that, through Pettit, TBOSA obtained a customer capable of making more than $130 million in deposits, more than $11,000 in overdraft, service, and wire charges (the "Bank Fees," **Exhibit B**), and approximately $6 million in loan payments (the "Loan Payments," **Exhibit C**). [4]

4.31    In September of 2023, Pettit pleaded guilty to three counts of wire fraud and money laundering related to the theft of approximately $65,000,000.00. The Debtors' fraud would not have been possible without the assistance, allowance, and willfully blind acts of TBOSA.

---

[4] Deposits are important to banks, which use the deposits to fund loans and investments. Therefore, deposits are often the primary funding source for banks and have a significant impact on a bank's liquidity.

**G. The Loan Payments are Fraudulent Transfers.**

4.32    The Loan Payments are transfers of property in which the Debtors owned an interest. The Loan Payments were charged from Pettit's personal account (Acct. No. X6425, the "Personal Account") and CP&A accounts (Acct. Nos. X1549 and X1556, the "CP&A Accounts"). Pettit also made Loan Payments from an Estate Management account (Acct. No. X1564). Pettit repeatedly and substantially removed and concealed assets by comingling personal and CP&A funds with monies in the Estate Management account, among other TBOSA Accounts.  (*See* **Exhibit F** - TBOSA Accounts Bank Transfers). For example, before and during the time of the Loan Payments, more than $500,000 of personal and CP&A funds were deposited into the Estate Management account. *See* **Exhibit F**.

4.33    The Red Flags, along with the Debtors' activities across the TBOSA Accounts, demonstrate the Debtors' actual intent to hinder, delay, or defraud creditors. Pettit freely and frequently transferred funds among his TBOSA Accounts throughout 2014 through 2022. At the time of the Bank Fees and Loan Payments, Debtors' creditors included the entities and individuals listed in **Exhibit D**.

4.34    Debtors were insolvent at the time of the Bank Fees and Loan Payments as they were unable to pay their debts as they became due.  For instance, from at least 2018 through 2022, the total liabilities of CP&A vastly exceeded the monies Debtors had to pay those obligations, even if the monies in the trust accounts, estate management account, operating accounts, and personal accounts are all considered sources for paying those liabilities (as Pettit often did).  The records reveal that from 2014 through 2022, Debtors' liabilities exceeded their assets, and they did not have the ability to pay their debts as they became due. For instance, Debtor's liabilities exceeded their liquid assets by more than $17 million in 2014, more than $19 million in 2015, more than $21 million in 2016, more than $24 million in 2017, more than $32 million in 2018,

more than $39 million in 2019, more than $100 million in 2020, more than $116 million in 2021, and more than $268 million in 2022. (*See* **Exhibit E** – Claims and Liabilities in Excess of Bank Account Balances). As such, the transfers at issue resulted from conduct undertaken after the Debtors began to encounter financial difficulties.

4.35    The Loan Payments were not simply monies deposited in Debtors' accounts for use by the Debtors; rather, the Loan Payments were made to TBOSA, which TBOSA retained, benefitted from, or used.  Debtors received no value (or reasonably equivalent value) for the Loan Payments. The Trustee has no records to suggest the Debtors received funds for the alleged loan or executed loan agreements governing the Loan Payments.

4.36    The Trustee seeks recovery of the harm suffered by the Estates. The Trustee does not seek recovery of damages or fraudulent transfers from IOLTA accounts or the direct claims of CP&A clients. But Pettit's commingling of funds and other fraudulent activities across the TBOSA Accounts, including the IOLTA accounts, are critical components of Pettit's fraudulent scheme and TBOSA's participation in it.


## V.  CAUSES OF ACTION

5.1    To the extent necessary, each of the claims set forth below is pleaded in the alternative.

### Count I

### Breach of Fiduciary Duty – Christopher Pettit, Individually

5.2    The Trustee incorporates the allegations, evidence presented, and recitations made in the above Paragraphs 4.1 through 4.36 as if fully set forth herein.

5.3    TBOSA is a bank as defined by the Texas Business & Commerce Code §4.105.

5.4    Generally, the elements of a claim for breach of fiduciary duty are (1) the existence

of a fiduciary duty, (2) breach of that duty, (3) causation, and (4) damages. A fiduciary relationship can be formal or informal. Formal fiduciary relationships arise as a matter of law, such as with attorney-clients, partnerships, and trustee relationships.[5] Informal fiduciary relationships can arise from moral, social, domestic, or purely personal relationships of trust and confidence.

5.5     Pettit, at the time of the events made the subject of this complaint, was a lawyer licensed in the State of Texas. He was also the sole director, but not the only lawyer, practicing under the law firm known as CP&A, which employed numerous individuals. As such, Pettit was a fiduciary to CP&A in his capacity as an officer and director of the law firm.

5.6     Pettit was a fiduciary to CP&A, and in turn, the CP&A clients, in his role as an officer and director of the law firm. Pettit's fiduciary relationship with CP&A clients arose by virtue of his legal representation of CP&A clients. CP&A clients trusted Pettit and placed a special confidence in Pettit to act in good faith and to not misappropriate funds.

5.7     Pettit owed a fiduciary duty in connection with funds in the TBOSA Accounts. Pettit – as authorized by TBOSA in violation of the KYC Rule – maintained control over those funds upon receiving them and owed duties of loyalty and care to CP&A and CP&A clients to deal honestly and in good faith with each of them. The fiduciary duty to use the funds in the manner expected and trusted by CP&A and the CP&A clients based upon the representations of Pettit.

5.8     TBOSA knew Pettit owed fiduciary duties to CP&A and CP&A clients who were represented by Pettit in a legal capacity and whose funds were deposited in the TBOSA Accounts.

5.9     Pettit breached his fiduciary duty to CP&A and CP&A clients by using their funds for purposes other than those intended. Pettit caused funds to be deposited into, maintained within, and transferred from the TBOSA Accounts inconsistent with the norms and rules for such

---

[5] *See id.* at 330.

accounts, and failed to operate the TBOSA Accounts in the manner and with the protections with which such trust accounts are required to be operated. Pettit misappropriated the funds in the TBOSA Accounts for his own personal gain and the gain of TBOSA.

5.10    As a result of Pettit's breach of his fiduciary duty, CP&A and its clients lost significant funds entrusted to TBOSA. Therefore, the CP&A Estate has been damaged in an amount to be determined at trial.

**Count II**

**Joint Participation Liability for Knowing Participation in Pettit's Breach of Fiduciary Duty – TBOSA**

5.11    The Trustee incorporates the allegations, evidence presented, and recitations made in the above Paragraphs 4.1 through 4.36 as if fully set forth herein.

5.12    The Texas Supreme Court has previously held that there is a claim for knowing participation in a breach of fiduciary duty in Texas. The general elements for a knowing-participation claim are: 1) the existence of a fiduciary relationship; 2) the third party knew of the fiduciary relationship; and 3) the third party was aware it was participating in the breach of that fiduciary relationship.

5.13    The fiduciary duty relationship between Pettit and CP&A is created by virtue of the fact that Pettit was an officer of CP&A. TBOSA knew this fiduciary relationship existed. Upon information and as evidenced in email communications be, TBOSA had access to CP&A's case list and knew of the insurance payments coming in on CP&A settlements, demonstrating TBOSA's knowledge of Pettit's fiduciary relationship with CP&A.

5.14    TBOSA knowingly permitted the TBOSA accounts to be operated in a manner that bore no reasonable resemblance to how they should actually be used. TBOSA had actual knowledge of the breach of fiduciary duties perpetrated by Pettit. TBOSA knew that the TBOSA Accounts had been used by Pettit to facilitate the deposit and withdrawal of unreasonably

excessive amounts of money over the course of the life of these accounts. Upon information and belief, TBOSA had actual knowledge of the chronic misuse of the TBOSA Accounts by Pettit and elected to disregard those actions in violation of its duty. TBOSA knew that its actions in permitting deposits into and withdrawals out of the accounts constituted a bad faith disregard of the duties of TBOSA to investigate Pettit's activities. TBOSA witnessed, and in some instances actually participated in, the clear and unambiguous events of misappropriation of funds in the TBOSA Accounts by facilitating the transfers for Pettit. TBOSA had a duty to investigate each of these events and it acted in bad faith when it _chose_ not to investigate or otherwise take action to protect the funds on deposit. TBOSA's actual knowledge of Pettit's actions and chronic misuse of the TBOSA Accounts by Pettit and election to disregard those actions in violation of its duty, include, without limitation (the "Red Flags"):

- More than 75 overdraft occurrences and more than 15 returned items across the TBOSA accounts, including from the CP&A and trust accounts;

- Payments to the TBOSA loans from IOLTA and Estate Management accounts; and

- Teller withdrawals from the Estate Management accounts.

5.15    TBOSA substantially benefited from the scheme perpetrated by Pettit, due not only to the substantial additional funds flowing through the bank as a result of the magnitude of the scheme, but also benefited from Pettit's misuse of the trust funds to pay TBOSA loans and a plethora of overdrafts, returned items, and other payments continuing for years. Through the scheme, TBOSA earned income from fees and from investing capital owned by CP&A as Pettit facilitated more than $130 million in deposits across the accounts throughout the years.

5.16    The evidence shows that but for TBOSA's willingness to enable Pettit's misuse of funds, the losses incurred by CP&A and CP&A clients through the TBOSA Accounts would not have occurred. As a result of Pettit's and TBOSA's conduct, the Estate of CP&A suffered harm,

for which it now sues, along with the disgorgement of fees and benefits received by TBOSA. The CP&A Estate has been damaged in an amount to be determined at trial.

## Count III

### Fraud – Christopher Pettit, Individually

5.17    The Trustee incorporates the allegations, evidence presented, and recitations made in paragraphs 4.1 through 4.36 as if fully set forth herein.

5.18    The elements of fraud under Texas law are (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's resilience on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation.[6]

5.19    From at least 2017 to 2022, Pettit defrauded CP&A and CP&A clients by making representations to each of them that he would act in their best interest in connection with the performance of the duties and functions to which Pettit agreed to perform.  Pettit further informed CP&A clients and CP&A that he would manage their accounts and needs with care and not remove funds without permission. Pettit would make these representations each time Pettit gained a new CP&A client, as he assured CP&A clients and CP&A that their money would be protected as TBOSA was a well-respected financial institution. Pettit made these representations, along with other representations, with the intent that CP&A and CP&A clients would act on those representations and to induce CP&A and CP&A clients to rely on Pettit's representations. In

---

[6] *See Exxon Corp. v. Emerald Oil & Gas Co.,* 348 S.W.3d 194, 217, 54 (Tex. 2011).

reliance on those representations, CP&A and CP&A clients entrusted Pettit, as well as TBOSA, with their money.

5.20   The fraud perpetrated against CP&A and CP&A clients arose out of the material misuse of funds on deposit in the TBOSA Accounts that Pettit had opened at TBOSA, including the misappropriation of funds for the personal benefit of Pettit and TBOSA to the direct financial detriment of the CP&A and CP&A clients.

5.21   Upon information and belief, Pettit's perpetrated fraud against CP&A and the CP&A clients also arose out of the various 1031 Exchanges. Pettit represented that CP&A was a qualified 1031 Exchange intermediary and that CP&A would receive, hold, and preserve these 1031 Exchange deposits in various TBOSA trust accounts for the sole and exclusive benefit of the CP&A clients. Further, in order for Pettit to perpetrate his fraud, Pettit tricked CP&A and the CP&A clients into allowing him to use TBOSA trust accounts by convincing them that his actions were lawful and that their funds would be protected.

5.22   Pettit made material misrepresentations that Pettit knew were false or made with reckless disregard for truth, which Pettit made with the intent that they would act, and did in fact act, on those representations, and which Pettit intended to serve as an inducement to rely on the representations of Pettit. CP&A and CP&A clients were induced to believe and find security in the fact that their funds were being maintained at one of Texas's premier banks and that those funds would be safe in the custody and under the watchful intelligence of that bank. CP&A and CP&A clients suffered injury by actively and justifiably relying on representations by Pettit.

5.23   As a proximate result of Pettit's and TBOSA's conduct, CP&A and its clients lost significant funds in the TBOSA Accounts. Therefore, the CP&A Estate suffered financial damages in an amount to be determined at trial.

**Count IV**

**Joint Tortfeasor Liability for Knowing Participation in the Perpetration of Fraud – TBOSA**

5.24    The Trustee incorporates the allegations, evidence presented, and recitations made in the above Paragraphs 4.1 through 4.36 as if fully set forth herein.

5.25    Under Texas law, the *Pierce Doctrine* states that a party is liable for fraud when it knowingly benefits from fraud – even if that party did not make the fraudulent statements or representations.  Numerous Texas Courts have affirmed the *Pierce Doctrine*, holding that a third party may be found liable for fraud when such party directly benefits from the fraud of another party. Furthermore, under *Pierce*, a party's willful blindness is sufficient to trigger liability for fraud under *Pierce's* "knowingly benefits from fraud" formula.  Pettit intentionally misrepresented and omitted material facts in connection with the use of the accounts held at TBOSA and Pettit's intention regarding the solicitation and acceptance of 1031 Exchange transactions, other client deposits, and funds owned by CP&A. CP&A and CP&A clients reasonably relied to its detriment on such representations and omissions by permitting the deposit of its funds into accounts at TBOSA. TBOSA knowingly and substantially provided material assistance to Pettit in furtherance of his scheme to defraud CP&A and its clients. TBOSA knowingly allowed Pettit to operate his accounts at TBOSA in violation of the applicable federal regulations and in a manner that bore no reasonable resemblance to how such trust accounts should actually be used. TBOSA knew that the trust accounts were not to be used for transferring in and out of into other accounts Pettit had at TBOSA, and numerous times TBOSA brought these transactions to Pettit's attention yet chose to turn a blind eye by allowing these transactions to continue. TBOSA witnessed ongoing evidence of fraudulent activity within Pettit's accounts, yet took no action to stop the misconduct, and ultimately, assisted in perpetrating the fraudulent scheme, as TBOSA continued to approve and execute all banking transactions involving the TBOSA Accounts.

5.26    Even if TBOSA did not *knowingly* perpetuate Pettit's fraud against CP&A and the clients of CP&A, TBOSA substantially benefitted from, and was *willfully* blind to, Pettit's fraud scheme as evidenced by TBOSA earning income from fees, using inflows to boost its deposit average metrics, and from investing capital derived from the 1031 Exchanges.

5.27    Thus, through the *Pierce Doctrine*, TBOSA is liable for Pettit's actions by being willfully blind to the fraud committed by Pettit, and knowingly benefitting from such fraud. By way of example, the employees at TBOSA that assisted Pettit and/or turned a willfully blind eye toward Pettit's actions include, but are not limited to, Brandi Vitier, Amanda McChesney, Alma Hayes, Michelle Garcia, Maria Breen, Kevin Harris, Lilliam Munoz, Stella Ramirez, and Cynthia Michael.

5.28    As a direct and proximate consequence of TBOSA's conduct as described in this complaint, CP&A and its clients lost significant funds entrusted to TBOSA. Therefore, the CP&A Estate has been damaged in an amount to be determined at trial.

## Count V

## Negligence and Gross Negligence –TBOSA

5.29    The Trustee incorporates the allegations, evidence presented, and recitations made in the above Paragraphs 4.1 through 4.36 as if fully set forth herein.

5.30    The Trustee advances this count in the alternative to its other claims.

5.31    At all relevant times, Pettit caused funds belonging to CP&A to be deposited into the TBOSA Accounts. TBOSA knew deposits were to be held in trust, but also knew the funds were being misappropriated and commingled for the present use of Pettit, including for payment of Pettit's personal debts and loans. For instance, TBOSA knew that the funds deposited into and funds that were withdrawn from the TBOSA trust accounts, including the Estate Management and IOLTA accounts, were not funds being held in a manner consistent with any of the norms and

requirements applicable to trust accounts or lawyer-specific trust accounts, a form of account TBOSA is and should be familiar with.

5.32    TBOSA owed a duty to CP&A and CP&A clients with respect to the maintenance of the TBOSA Accounts, beginning from the first instance in which Pettit began making suspicious transfers to other TBOSA Accounts to cover various overdrafts, and potentially, even earlier than this. TBOSA's duty arose at the opening of the TBOSA Accounts, and no later than the first withdrawal by Pettit of funds from the TBOSA trust accounts into other accounts and arises independently from any contract.

5.33    TBOSA breached its duty to CP&A and CP&A clients when it allowed the TBOSA trust accounts (the Estate Management and IOLTA accounts) to be operated in a manner that bore no reasonable resemblance to how such accounts are required to be operated and used. TBOSA allowed Pettit to repeatedly transfer funds among the TBOSA Accounts and other trust accounts to ensure the accounts would not become overdrawn. TBOSA also allowed Pettit to use TBOSA trust account funds to pay his personal debts and loans. As such, TBOSA witnessed systematic, continuous evidence of money laundering and fraudulent activity, but took no action to stop the misconduct or misuse of funds, and instead continued to perpetrate the scheme and continued to execute all requested banking transactions involving the accounts at TBOSA, as TBOSA and its employees knowingly disregarded its own policies and procedures as well as federal regulations by repeatedly failing to investigate the fraud and misuse of the TBOSA Accounts. The actions, or rather inactions, of TBOSA, were at a minimum, negligent, and on information and belief, grossly negligent in light of TBOSA's failure to act on the countless events detailed above which would have placed any other similarly situated financial institution on notice to act immediately to end the scheme Pettit continued to engage in with the help of TBOSA. TBOSA was aware of Red Flags that should have required TBOSA to raise Pettit to the top of their lists of fraudulent activity and

knew that if action wasn't appropriately taken, CP&A and CP&A clients would be harmed. As such, TBOSA's acts and omissions, when viewed objectively from its standpoint at the time of the occurrence involved an extreme degree of risk, considering the probability and magnitude of potential harm to others. Likewise, TBOSA had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

5.34    As a direct and proximate cause of the breach by TBOSA of the duty as described throughout this complaint, the CP&A Estate has suffered financial damages in an amount to be determined at trial.

## Count VI

## Fraudulent Transfer (Bankruptcy Code § 548(a)(1)(A))

5.35    The Trustee incorporates the allegations, evidence presented, and recitations made in the above Paragraphs 4.1 through 4.36 as if fully set forth herein.

5.36    The Debtors transferred Loan Payments to TBOSA, which constituted transfers of the Debtors' property, transferred within two years of the petition date (from June 1, 2020, to June 1, 2022), with actual intent to hinder, delay, and defraud their creditors, including, without limitation, the creditors identified in **Exhibit D**.

5.37    The Loan Payments together with the Red Flags and other activities of the Debtors across the TBOSA Accounts, as pleaded herein, exhibit at least the following badges of fraud indicating "actual intent" under § 548(a)(1)(A):

    a)  The value of the consideration received by the Debtors was not reasonably equivalent to the value of the asset;

    b)  The Debtors removed or concealed assets;

    c)  The Debtors were insolvent or became insolvent shortly after the transfer was made; and

d) The transfers occurred shortly before or shortly after a substantial debt was incurred.

5.36    TBOSA did not receive the Loan Payments in good faith but instead knew or should have known that Pettit was operating a fraud and money laundering operation.

5.37    Accordingly, the Trustee seeks the avoidance of the Loan Payments under section 548(a)(1)(A) of the Bankruptcy Code.

## Count VII

### Fraudulent Transfer (Bankruptcy Code § 548(a)(1)(B))

5.38    The Trustee incorporates the allegations, evidence presented, and recitations made in the above Paragraphs 4.1 through 4.36 as if fully set forth herein.

5.39    The Debtors transferred the Loan Payments to TBOSA, which constituted transfers of the Debtors' property, transferred within two years of the petition date (June 1, 2020, to June 1, 2022), from funds that were otherwise available to pay to their creditors, including, without limitation, the creditors identified in **Exhibit D**.

5.40    The Debtors were insolvent at the time the Loan Payments were transferred to TBOSA, as described in detail above and shown in in **Exhibit E**.

5.41    The Debtors did not receive reasonably equivalent value for the Loan Payments. The Trustee has no records to suggest the Debtors received funds for the alleged loan or executed loan agreements governing the Loan Payments.

5.42    Accordingly, the Trustee seeks the avoidance of the Loan Payments under section 548(a)(1)(B) of the Bankruptcy Code.

## Count VIII

### Recovery of Fraudulent Transfer (Bankruptcy Code § 550(a)(1)–(2))

5.43    The Trustee incorporates the allegations, evidence presented, and recitations made in the above Paragraphs 4.1 through 4.36 as if fully set forth herein.

5.44    The Trustee requests the recovery of the avoided Loan Payments under section 550(a)(1)-(2) of the Bankruptcy Code by way of money judgment against TBOSA and turnover of any assets of TBOSA as identifiable proceeds of the transfers.

## Count IX

### Fraudulent Transfer (Texas Uniform Fraudulent Transfer Act, "TUFTA")

5.45    The Trustee incorporates the allegations, evidence presented, and recitations made in the above Paragraphs 4.1 through 4.36 as if fully set forth herein.

5.46    The Trustee brings claims under Bankruptcy Code § 544 and TUFTA. Certain creditors, including without limitation those identified in **Exhibit D**, held claims against the Debtors that arose before or within a reasonable time after the Loan Payments and were asserted as claims against the Debtors' estates as of the petition date.

5.47    The Debtors transferred the Loan Payments to TBOSA with intent to hinder, delay, and defraud their creditors. The Loan Payments together with the Red Flags and other activities of the Debtors across the TBOSA Accounts, as pleaded herein, exhibit at least the following badges of fraud indicating "actual intent" under TEX. BUS. & COM. CODE § 24.005(a)(1):

  a.   The value of the consideration received by the Debtors was not reasonably equivalent to the value of the asset;

  b.   The debtor removed or concealed assets;

  c.   The Debtors were insolvent or became insolvent shortly after the transfer was made; and

  d.   The transfers occurred shortly before or shortly after a substantial debt was incurred.

5.48    The Debtors transferred the Loan Payments to TBOSA without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the Debtors were

engaged or were about to engage in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction or intended to incur, or believed or reasonably should have believed that the Debtors' would incur, debts beyond the debtor's ability to pay as they became due. (TEX. BUS. & COM. CODE § 24.005(a)2)).

5.49    The Debtors transferred the Loan Payments to TBOSA for less than reasonably equivalent value, and those transfers were made when the Debtors were insolvent, or the transfers rendered it insolvent. (TEX. BUS. & COM. CODE § 24.006(a)).

5.50    The Trustee —standing in the shoes of a creditor—brings these claims within one year after the fraudulent nature of the transfers was discovered or could reasonably have been discovered. Under TUFTA Section 24.010(a)(1), "a cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought: (1) under Section 24.005(a)(1) of this code, within four years after the transfer was made or the obligation was incurred **or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant**." (TEX. BUS. & COM. CODE § 24.010(a)(1)). With respect to the latter portion of this statute, the discovery rule, allows a fraudulent-transfer claim to be filed within one year of when the fraudulent *nature* of the transfer was or reasonably could have been discovered.

5.51    The fraudulent transfers at issue were transferred by the Debtors with intent to hinder, delay, and defraud their creditors. TEX. BUS. & COM. CODE § 24.005(a)(1). As such, the one-year discovery rule under Section 24.010(a)(1) applies.

5.52    The Trustee—standing in the shoes of a creditor—could not have reasonably discovered the fraudulent nature of the transfers until the time that the bankruptcy proceeding began on June 1, 2022, or one year prior to the initiation of the bankruptcy proceeding at the earliest. Prior to June 1, 2021, creditors of the Debtors' estates were not aware that Pettit had a

TBOSA loan account or a line of credit at TBOSA; creditors were not aware of the unusual activity in the TBOSA loan account; and creditors were not aware the TBOSA loan account constituted antecedent debt or that no reasonable value was received for the Loan Payments made to the TBOSA loan account. In fact, the Trustee (standing in the shoes of a creditor) could not reasonably have discovered the fraudulent nature of the transfers **until the time that Pettit pled guilty to fraud in September of 2023.**

5.53    Thus, the Bankruptcy Code § 544 and TUFTA fraudulent transfer claims were viable as of the beginning of the bankruptcy proceeding on June 1, 2022, and the Trustee properly filed these claims within two years from that date under section 546(a) of the Bankruptcy Code.

5.54    The Trustee is entitled to avoid the transfers and recover the money the Debtors transferred to TBOSA via the Loan Payments, or if the Court orders, the value of the transfers to satisfy creditor claims pursuant to chapter 24 of the Texas Uniform Fraudulent Transfer Act ("TUFTA"), including sections 24.005(a), 24.008, and 24.009, made applicable to this proceeding by section 544 of the Bankruptcy Code.

5.55    Additionally, the Trustee is entitled to recover his reasonable attorneys' fees and costs incurred in the prosecution of this matter. (TEX. BUS. & COM. CODE §24.013).

## VI.    EXEMPLARY DAMAGES

6.1    The Trustee restates and realleges each paragraph above as if fully set forth herein.

6.2    The Trustee seeks exemplary damages against Petitt and TBOSA for their fraud, malice, and/or gross negligence.  The Trustee requests exemplary damages in excess of any statutory cap as Petitt's and TBOSA's conduct constitutes a knowing, intentional or reckless misapplication of fiduciary property.

## VII.    PRAYER

For the reasons above, the Trustee respectfully requests that it have and recover judgment

against TBOSA as follows:

a.    Award the Trustee monetary damages, including all actual damages, consequential, and punitive damages and pre-and post-judgment interest, and disgorgement of fees and benefits received by TBOSA;

b.    Award the Trustee reasonable attorneys' fees and costs; and

c.    Grant the Trustee all such other and further relief, at law or in equity, to which he may be justly entitled.

Dated: August 30, 2024

Respectfully submitted,

/s/ Francisco Guerra, IV.
FRANCISCO GUERRA, IV.
Tex. Bar No. 00796684
Email: fguerra@guerrallp.com
JORGE L. MARES
Tex. Bar No. 24087973
Email: jmares@guerrallp.com
EDWARD ALLRED
Tex. Bar No. 50511764
Email: eallred@guerrallp.com
ALEXIS R. GARCIA
Tex. Bar No. 24117204
Email: argarcia@guerrallp.com
JESSICA PEISEN
Tex. Bar No. 24118196
Email: jpeisen@guerrallp.com
DAVID FUENTES
Tex. Bar No. 24132048
Email: dfuentes@guerrallp.com
KELSEY ABBEY
Tex State Bar No. 24115652
Email: kabbey@guerrallp.com

**GUERRA LLP**
875 East Ashby Place
Suite 1200
San Antonio, Texas 78212
Telephone: (210) 447-0500
Facsimile: (210) 447-0501

-and-

Jason M. Rudd
Tex. Bar No. 24028786
Email: jason.rudd@wickphillips.com
Jacob T. Fain
Tex. Bar No. 24053747
Email: jacob.fain@wickphillips.com
Scott D. Lawrence
Tex. Bar No. 24087896
Email: scott.lawrence@wickphillips.com

**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, TX 75204
Phone: (214) 692-6200
Fax: (214) 692-6255

COUNSEL FOR ERIC TERRY, CHAPTER 11
TRUSTEE FOR THE ESTATES OF CHRIS PETTIT &
ASSOCIATES AND CHRISTOPHER JOHN PETTIT

## CERTIFICATE OF SERVICE

I certify that on the 30th of August 2024, a copy of the foregoing, *Plaintiff's First Amended Complaint*, was filed electronically and served by e-mail or by mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

*/s/ Francisco Guerra, IV.*
Francisco Guerra, IV.

## ECF SERVICE LIST

| | | |
|---|---|---|
| Leslie M. Luttrell<br>Lutrell + Carmody Law Group 100 NE Loop 410, Suite 615<br>San Antonio, TX 78216<br>luttrell@lclawgroup.net | Bill Kingman<br>Law Offices of William B. Kingman, P.C.<br>3511 Broadway<br>San Antonio, TX 78209<br>bkingman@kingmanlaw.com | Caroline Newman Small<br>Davis & Santos, PLLC<br>719 S. Flores Street<br>San Antonio, TX 78204<br>csmall@dslawpc.com |
| Michael C. Sanders<br>Sanders LLP<br>P.O. Box 27932<br>Houston, TX 77227<br>mcs@sandersfirm.law | Don Stecker<br>Linebarger Goggan Blair & Sampson<br>112 E. Pecan, Suite 2200<br>San Antonio, TX 78205<br>don.stecker@lgbs.com | David S. Gragg<br>Langley & Banack, Inc.<br>745 East Mulberry Ave., Suite 700 San Antonio, TX 78212<br>dgragg@langleybanack.com |
| Carl J. Kolb<br>Carl J. Kolp, P.C.<br>926 Chulie Dr.<br>San Antonio, TX 78216<br>service@carlkolblaw.com | William P Germany<br>Bayne, Snell & Krause<br>1250 N.E. Loop 410, Suite 725<br>San Antonio, TX 7820<br>wgermany@bsklaw.com | Elizabeth G. Smith<br>Law Offices of Elizabeth G. Smith 6655 First Park Ten, Suite 240<br>San Antonio, TX 78213<br>beth@egsmithlaw.com |
| Elliott S. Cappuccio<br>Pulman, Cappuccio & Pullen, LLP<br>2161 NW Military Hwy, Ste 400<br>San Antonio, TX 78213<br>ecappuccio@pulmanlaw.com | Anna K. MacFarlane<br>Pulman, Cappuccio & Pullen, LLP<br>2161 NW Military Hwy, Ste 400<br>San Antonio, TX 78213<br>amacfarlane@pulmanlaw.com | Lee Gordon<br>McCreary, Veselka, Bragg & Allen, P.C.<br>P.O. Box 1269<br>Round Rock, TX 78680<br>bankruptcy@mvbalaw.com |
| David A. Jones<br>DJ Law<br>110 E. Houston Street, 8th Floor<br>San Antonio, TX 78205<br>david@djlawpartners.com | Gerrit Schulze<br>Shumway Van<br>13750 San Pedro, Suite 810<br>San Antonio, TX 78232<br>Gerrit@shumwayvan.com | Alexander Wyatt Wright<br>Wayne Wright LLP<br>5707 W Interstate 10<br>San Antonio, TX 78201<br>wyatt@waynewright.com |
| Randall A. Pulman<br>Pulman Cappuccio & Pullen LLP 2161 NW Military Hwy, Suite 400 San Antonio, TX 78213<br>rpulman@pulmanlaw.com | Duane J. Brescia<br>Clark Hill Strasburger<br>720 Brazos Street, Ste. 700<br>Austin, TX 78701 dbrescia@clarkhill.com | Martin Seidler<br>Law Offices of Martin Seidler<br>11107 Wurzbach, Suite 504<br>San Antonio, TX 78230<br>marty@seidlerlaw.com |
| Christopher Adams<br>Okin Adams LLP<br>1113 Vine St, Suite 240<br>Houston, TX 77002<br>cadams@okinadams.com | Jarrod Martin/ Reagan "Tres" Gibbs III<br>Chamberlain Hrdlicka<br>1200 Smith Street, Suite 1400<br>Houston, TX 77002<br>jarrod.martin@chamberlainlaw.com<br>tres.gibbs@chamberlainlaw.com | Dean William Greer Dean W. Greer<br>2929 Mossrock, Suite 204 San Antonio, TX 78230-5141<br>dean@dwgreerlaw.com |
| Lisa C. Fancher | Brenda A Likavec | David C. Alford |

| | | |
|---|---|---|
| Fritz, Byrne, Head & Gilstrap 221 W Sixth Street, Ste 960 Austin, TX 78701 lfancher@fbhg.law | Codilis & Moody, P.C. 400 N. Sam Houston Pkwy E. Ste 900a Houston, TX 77060 brenda.likavec@il.cslegal.com | Pakis, Giotes, Page & Burleson 400 Austin Ave., Ste. 400 P. O. Box 58 Waco, TX 76703-0058 alford@pakislaw.com |
| David N. Deaconson Pakis, Giotes, Page & Burleson P. O. Box 58 Waco, TX 76703-0058 deaconson@pakislaw.com | James Samuel Wilkins James S. Wilkins, PC 1100 NW Loop 410, Suite 700 San Antonio, TX 78213 jwilkins@stic.net | Mark W. Steirer Law Office of Mark Steirer 10330 White Rock Place Dallas, TX 75238 marksteirer@sbcglobal.net |
| Matthew Mark Cowart Law Offices of Matthew M. Cowart 6609 Blanco Road, #235 San Antonio, TX 78216 mcowartlaw@yahoo.com | Raymond W. Battaglia Law Offices of Ray Battaglia, PLLC 66 Granburg Circle San Antonio, TX 78218 rbattaglialaw@outlook.com | United States Trustee – SA12 US Trustee's Office 615 E Houston, Suite 533 San Antonio, TX 78295-1539 USTPRegion07.SN.ECF@usdoj.gov |
| Stephen W. Sather Barron &Newburger, P.C. 7320 N. MoPac Expwy., Ste 400 Austin, TX 78731 ssather@bn-lawyers.com | Abbey U. Dreher Barrett Daffin Frappier Turner & Engel 4004 Belt Line Rd., Ste. 100 Addison, TX 75001 WDECF@BDFGROUP.COM | Julia W. Mann Jackson Walker LLP 112 E Pecan St, Suite 2400 San Antonio, TX 78205 jmann@jw.com; laguilar@jw.com |
| William H. Oliver Oliver Law Firm 7898 Broadway, Suite 120 San Antonio, TX 78209 wholiver@oliverlawfirmsa.com | J. Scott Rose Jackson Walker, LLP 112 E Pecan St, Suite 2400 San Antonio, TX 78205 srose@jw.com; kgradney@jw.com | John F. Carroll 111 West Olmos Drive San Antonio, TX 78212 jcarrollsatx@gmail.com |
| Eric Terry Eric Terry Law, PLLC 3511 Broadway San Antonio, TX 78209 eric@ericterrylaw.com | Aubrey L. Thomas Office of the US Trustee, Region 7 615 E. Houston St., Suite 533 San Antonio, TX 78205 aubrey.thomas@usdoj.gov | Mercedes-Benz Financial Services USA c/o Ed Gezel, Agent/ BK Servicing P.O. Box 131265 Roseville, MN 55113-0011 notices@bkservicing.com |
| Jennifer Francine Wertz Jackson Walker LLP 100 Congress Avenue, Suite 1100 Austin, TX 78701 kgradney@jw.com; jwertz@jw.com; dtrevino@jw.com | Brian Dennis Lang Law Firm P.C. 10500 Heritage Blvd., Suite 200 San Antonio, TX 78216 brian@langfirm.com; evangelina@langfirm.com | Vincent P. Slusher/ Kristen L. Perry Faegre Drinker Biddle & Reath LLP 1717 Main Street, Suite 5400 Dallas, TX 75201 vince.slusher@faegredrinker.com kristen.perry@faegredrinker.com |

| | | |
|---|---|---|
| Julie Parsons<br>McCreary Veselka Bragg & Allen PC<br>PO Box 1269<br>Round Rock, TX 78680<br>jparsons@mvbalaw.com | Blake Rasner<br>Haley & Olson, PC<br>100 N. Ritchie Road, Suite 200<br>Waco, TX 76712<br>brasner@haleyolson.com | Joseph Little<br>The Little Law Firm PC<br>440 Louisiana Street, Suite 900<br>Houston, TX 77002<br>jrl@littlelawtexas.com |
| H. Anthony Hervol<br>Law Office of H. Anthony Hervol<br>4414 Centerview Drive, Suite 207<br>San Antonio, TX 78228<br>hervol@sbcglobal.net | Kathryn N. Dahlin<br>Codilis & Moody, P.C.<br>400 N. Sam Houston Pkwy E., Ste 900 A Houston, TX 77060<br>TX.bkpleadingsWEST@tx.cslegal.com | Morris E. "Trey" White III<br>Villa & White, LLP<br>1100 NW Loop 410 #802<br>San Antonio, TX 78213<br>treywhite@villawhite.com |
| Guillermo A. Flores, Jr.<br>Law Offices of G.A. Flores, Jr. 630 Broadway<br>San Antonio, TX 78215<br>gafloreslaw@yahoo.com | Diane W. Sanders<br>Linebarger Goggan Blair & Sampson<br>P.O. Box 17428<br>Austin, TX 78760-7428<br>austin.bankruptcy@lgbs.com | Michael J. Black<br>Burns & Black, PLLC<br>750 Rittiman Road<br>San Antonio, TX 78209-5500<br>mblack@burnsandblack.com |
| Charlie Shelton<br>Hayward PLLC<br>901 MoPac Expressway S., Bldg. 1, # 300<br>Austin, TX 78746<br>CShelton@HaywardFirm.com | Jay H. Ong<br>Munsch Hardt Kopf & Harr, P.C.<br>1717 West 6th Street, Suite 250<br>Austin, TX 78703<br>jong@munsch.com | Melissa S. Hayward<br>Hayward PLLC<br>10501 N. Central Expy, Ste. 106<br>Dallas, TX 75231<br>MHayward@HaywardFirm.com |
| Mark B. French<br>Law Office of Mark B. French<br>1901 Central Drive, Suite 704<br>Bedford, TX 76021<br>mark@markfrenchlaw.com | Tara L. LeDay<br>Chamberlain, Hrdlicka<br>1200 Smith Street, Suite 1400<br>Houston, TX 77002<br>tara.leday@chamberlainlaw.com | David McQuade Liebowitz<br>Law Offices of David Leibowitz<br>517 Soledad Street<br>San Antonio, TX 78205<br>service@leibowitzlaw.com |
| Thomas M. Farrell McGuireWoods LLP<br>845 Texas Avenue, Suite 2400<br>Houston, TX 77002<br>tfarrell@mcguirewoods.com | John Thomas Oldham<br>Okin Adams LLC<br>1113 Vine St, Suite 240<br>Houston, TX 77002<br>joldham@okinadams.com | Michael Flume<br>Flume Law Firm, LLP<br>1020 N.E. Loop 410, Suite 530<br>San Antonio, TX 78209<br>mflume@flumelaw.net |
| John W. Hodges, Jr.<br>Hendley and Hodges Law PLLC<br>29710 US Hwy 281 N, Ste 300<br>Bulverde, Texas 78163<br>john@hhtx.law | Steven E. Seward<br>Assistant U.S. Attorney<br>601 N.W. Loop 410, Suite 600<br>San Antonio, TX 78216<br>Steven.Seward@usdoj.gov | Ronald J. Smeberg<br>The Smeberg Law Firm, PLLC<br>4 Imperial Oaks<br>San Antonio, TX 78248<br>ron@smeberg.com |
| Trey A. Monsour<br>Fox Rothschild LLP<br>2501 N. Harwood Street, # 1800<br>Dallas, TX 75201-0889<br>tmonsour@foxrothschild.com | Kayla Britton/ Elizabeth Little<br>Faegre Drinker Biddle & Reath LLP<br>600 E. 96th Street, Suite 600<br>Minneapolis, MN 55402 | Courtney J. Hull/ Asst Atty General<br>Attorney General's Office<br>Bankruptcy & Collections Division<br>P.O. Box 12548 |

| | kayla.britton@faegredrinker.com elizabeth.little@faegredrinker.com | Austin, TX 78711-2548 sherri.simpson@oag.texas.gov |
|---|---|---|
| Lawrence Morales II The Morales Firm, P.C. 6243 W. Interstate 10, Suite 132 San Antonio, TX 78201 lawrence@themoralesfirm.com | Robert Barrows Langley & Banack, Inc. 745 East Mulberry Ave., Suite 700 San Antonio, TX 78212 rbarrows@langleybanack.com | Mitchell Buchman Barrett Daffin Frappier Turner & Engel 1900 St. James Place, Suite 500 Houston, TX 77056 sdecf@bdfgroup.com |
| Clint Buck Branscomb, PLLC 4630 N Loop 1604 West, Ste 206 San Antonio, TX 78249 cbuck@branscomblaw.com | John F. Carroll 111 West Olmos Drive San Antonio, TX 78212 jcarrollsatx@gmail.com | Wells Fargo Bank, NA Jarrod D. Shaw/Alexander Madrid McGuireWoods, LLP 260 Forbes Avenue, Suite 1800 Pittsburgh, PA 1522 jshaw@mcguirewoods.com amadrid@mcguirewoods.com |
| Jason Rudd & Scott Lawrence Wick Phillips Gould & Martin, LLP 3131 McKinney Ave., Suite 500 Dallas, TX 75204 Jason.rudd@wickphillips.com Scott.lawrence@wickphillips.com | Lauren E. Hayes & Lynn Butler Husch Blackwell LLP 111 Congress Avenue, Suite 1400 Austin, TX 78701 lauren.hayes@huschblackwell.co lynn.butler@huschblackwell.com | Norton Rose Fulbright US LLP Michael O'Donnell, Steve Peirce 111 W. Houston Street, Suite 1800 San Antonio, TX 78205 mike.odonnell@nortonrosefulbrigh t steve.peirce@nortonrosefulbright |
| Norton Rose Fulbright US LLP Stephen Mark Dollar 1301 Avenue of the Americas New York, NY 10019 steve.dollar@nortonrosefulbright | Norton Rose Fulbright US LLP Ryan Meltzer 98 San Jacinto Blvd., Suite 1100 Austin, TX 78701 ryan.meltzer@nortonrosefulbright | |