

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: June 04, 2025.**

_Craig A. Gargotta_

_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-50591-CAG |
| | § | CASE NO. 22-50592-CAG |
| | § | (JOINTLY ADMINISTERED) |
| CHRIS PETTIT & ASSOCIATES, P.C. and | § | |
| CHRISTOPHER JOHN PETTIT | § | |
| Debtors. | § | CHAPTER 11 |

| | | |
|---|---|---|
| ERIC TERRY, in his capacity as CHAPTER | § | |
| 11 TRUSTEE for DEBTORS | § | |
| Plaintiff, | § | |
| v. | § | ADV. NO. 24-05031-CAG |
| | § | |
| TEXAS PARTNERS BANK d/b/a THE | § | |
| BANK OF SAN ANTONIO and | § | |
| CHRISTOPHER JOHN PETTIT, individually, | § | |
| Defendant. | § | |

### MEMORANDUM ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (ECF No. 50)

Before the Court is chapter 11 Trustee Eric Terry's ("Trustee") First Amended Complaint (ECF No. 33),[1] Texas Partners Bank's ("Defendant") Motion to Dismiss (ECF No. 50), Plaintiff's

---

[1] "ECF" denotes electronic case number.

Response (ECF No. 72), Defendant's Reply in Support of its Motion to Dismiss (ECF No. 82), Defendant's Supplemental Briefing in Support of Motion to Dismiss First Amended Complaint (ECF No. 95), and Plaintiff's Supplemental Briefing of Law of Opposition (ECF No. 96).[2] The Court set the matter for a hearing, heard oral argument, and ultimately took this matter under advisement for a memorandum order. After considering the arguments made and counsels' pleadings, for the reasons stated here, Defendant's Motion to Dismiss is **GRANTED WITH PREJUDICE**.

JURISDICTION

This Court has jurisdiction over this Motion to Dismiss pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A) (administration of the estate) and (H) (proceedings to determine, avoid, or recover fraudulent conveyances). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for relief is Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding through Fed. R. Bankr. P. 7012 and Local Rule 7012. This case is referred to this Court under the District Court's Order on reference.

PARTIES' CONTENTIONS AND BACKGROUND

In general, when a checking account is created through a bank, a signature card is signed by the account holder which includes a deposit or account agreement setting forth the bank and customer's obligations. U.C.C. § 3-417 cmt. 3 (1999). Under Texas law, the Uniform Commercial Code ("UCC") regulates banks' relationships with its Texas customers and its handling of funds transfers. *See generally* TEX. BUS. & COM. CODE §§ 3.101–605 (negotiable instruments), id. §§ 4.101–.504 (bank deposits and collections), §§ 4A.101–.507 (funds transfers); ***Bank of Tex. v.***

---

[2] The Court reviewed Defendant's Reply and both parties' supplemental briefing, but found that the filings did not provide significantly different arguments from what Defendant already argued in its Motion to Dismiss and Trustee had noted in its Response. As such, the Court's focus herein will largely focus on the First Amended Complaint, Motion to Dismiss, and Response to ensure clarity and brevity.

*VR Elec., Inc.*, 276 S.W.3d 671, 683 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (explaining that the UCC creates "a discrete fault scheme, specifically allocating responsibility among parties to a banking relationship"). "The relationship may also be governed in part by agreements between the bank and its customer, such as an agreement governing the processing of negotiable instruments presented to the bank." ***Conts. Source, Inc. v. Amegy Bank Nat'l Ass'n***, 462 S.W.3d 128, 128 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

In in its First Amended Complaint, Trustee argues that Texas Partners Bank ("Defendant" or "Bank") aided and assisted Christopher Pettit and Chris Pettit & Associates, P.C. ("Debtors" or "Pettit"), a disgraced former lawyer who since pleaded guilty to defrauding his clients out of millions of dollars. (ECF No. 33 at 2). As background, in April 2017, Defendant opened numerous accounts for Pettit including loans and brokerage accounts as collateral for a line of credit. Pettit opened at least eleven accounts with Defendant, including personal checking accounts, two IOLTA accounts, an Estate Management account for CP&A, as well as accounts for Piccoli Properties, Inc. and Oak Hills Financial Group, Inc., which managed Pettit's rental properties. The accounts ultimately facilitated approximately $130 million in deposits. (ECF No. 33 at 7).

Over the years, Pettit over drafted his accounts on 75 occasions, made payments from the bank's loans to the IOLTA and Estate Management accounts, and accessed additional teller withdrawals from the Estate Management account. (ECF No. 33; Ex. G). At times, overdrafts were approved on some trust accounts prior to Defendant obtaining verification that Pettit could deposit enough money to cure the defects. (ECF No. 33 at 9). In other instances, Defendant's Managing Director Cynthia Michael noticed that Pettit's line of credit had reached the maximum allowable balance, leading her to offer Pettit various mechanisms to cure the defects. (ECF No. 33 at 11). Similarly, Defendant employee Amanda McChesney also noted that Defendant's account was out

3

of compliance with the "LOC margin agreement," and McChesney provided Pettit with three options to cure the noncompliance in an email. (ECF No. 33 at 11). Pettit later filed for bankruptcy with this Court, and a chapter 11 trustee was appointed. Trustee has since brought various adversary proceedings against financial institutions.

In its First Amended Complaint, Trustee argues that Pettit's success in defrauding his clients was only made possible through Defendant's willingness to "endorse and profit from the known abuse of various trust accounts" which included:

> ignoring hundreds of financial wire transfers that should have stood out as "red flags," ignoring numerous over-drafting of accounts that should have stood out as "red flags," ignoring numerous wire transfers from accounts that simply did not have the funds, accepting Pettit's unsensible explanations for issues [Defendant] had identified, actively instructing Pettit on ways to disguise reportable events or use work arounds to prevents any eyebrows from being raised while securing more funds.

(ECF No. 33 at 3). In Trustee's theory of the case, Defendant routinely ignored problematic transactions in favor of promoting its own financial gain. (ECF No. 33 at 19). Trustee initially brought suit against Defendant for a variety of causes of action, but the remaining claims are (1) knowing participation in fraud and breach of fiduciary duty, (2) negligence and gross negligence, and (4) exemplary damages.[3] In Defendant's Motion to Dismiss, Defendant bifurcates

---

[3] The First Amended Complaint includes the following remaining causes of action:
    (1) breach of fiduciary duty as to Christopher Pettit, individually;
    (2) joint participation liability for knowing participation in Pettit's breach of fiduciary duty as to Defendant;
    (3) fraud as to Christopher Pettit, individually;
    (4) joint tortfeasor liability for knowing participation in the perpetration of fraud as to Defendant; negligence and gross negligence as to Defendant;
    (5) fraudulent transfer under 11 U.S.C. § 548(a)(1)(A);
    (6) fraudulent transfer under 11 U.S.C. § 548(a)(1)(B);
    (7) recovery of fraudulent transfer under 11 U.S.C. § 550(a)(1)–(2);
    (8) fraudulent transfer under the Texas Uniform Fraudulent Transfer Act ("TUFTA");
    (9) exemplary damages.
*See generally* (ECF No. 33). The Court will address only the causes of action against Texas Partners Bank in this memorandum order. Arguments surrounding exemplary damages are scant.

its arguments into standing arguments under Federal Rule of Civil Procedure ("F.R.C.P." or "Rule") and failure to state a plausible claim for relief pursuant to Rule 12(b)(6). The Court will address Defendant's arguments, in turn, below.

DISCUSSION

## I.    Legal Standard

In the Fifth Circuit, when considering a motion to dismiss for failure to state a claim, the court must "accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff." *Thompson v. City of Waco, Texas*, 764 F.3d 500, 502–03 (5th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "To survive dismissal, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 570 (holding that the complaint must allege enough facts to move the claim "across the line from conceivable to plausible"). The determination of whether the plausibility standard has been met is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc) ("Our task, then, is to determine whether the plaintiff stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.").

"On a motion to dismiss, the court may properly consider the documents attached to or incorporated by reference in the plaintiff's complaint, facts of which judicial notice may be taken, and matters of public record." *U.S. ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017–18

5

(5th Cir. 1996)). "When a complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend before dismissing the action with prejudice unless it is clear that the defects in the complaint are incurable." ***Tow v. Amegy Bank N.A.***, 498 B.R. 757, 765 (S.D. Tex. 2013).[4]

## II.     Legal Analysis

### a.   *F.R.C.P. 12(b)(1) Standing*

An everything-but-the-kitchen-sink approach to a motion sometimes results in an unfortunate muddling of potentially meritorious arguments and significantly burdens judicial resources. Trustee maintained the same arguments surrounding various "red flags"—despite rejection of that theory in similar Pettit-related adversaries. After straining through Defendant's first round of arguments, most of which were already adjudicated by this Court in similar Pettit-related adversaries, the Court finds that none of Defendant's standing arguments have merit for the reasons stated below.

### i.   ***Verstuyft*** is Distinguishable from the Case at Bar

Defendant argues that there are "two inescapable facts about the First Amended Complaint" that create a legal standing issue. (ECF No. 95 at 9). Defendant argues that Trustee's claims are improperly traceable to CP&A, which allegedly precludes Trustee from asserting under this Court's ruling in ***Verstuyft***, and the First Amended Complaint improperly "lumps *all* of the various account types together under the moniker "TBOSA Accounts."" (ECF No. 95 at 9).[5] In

---

[4] Trustee has already amended its complaint once. Many of Trustee's arguments in its First Amended Complaint are identical to rejected arguments in similar Pettit-related adversaries. Many of Defendant's arguments are also identical to those of other financial institutions in other Pettit-related adversaries previously rejected by this Court.

[5] Defendant specifically points to the Court's prior findings that:

> (i) Pettit had sole control over CP&A and the two were in fact a unity irrespective of any corporate form; (ii) CP&A was not harmed by Pettit's theft; (iii) the Trustee lacked standing to assert claims for recovery of client funds deposited into IOLTA trust accounts, and such claims were properly dismissed under Rule 12(b)(1); and (iv) the Trustee's only viable claims in *Verstuyft* were based on funds traceable to CP&A.

Defendant's view, Trustee needed to provide evidence "establishing that CP&A suffered an injury and therefore had standing to sue." (ECF No. 95 at 9). Defendant claims that Trustee's provided documents fail to demonstrate that CP&A suffered "any injury" and Trustee's Response fails to make the "required showing of an actual injury in fact that is concrete and particularized to the Debtors with a causal nexus between that injury and the alleged actions of the Bank." *See* (ECF No. 95 at 10) ("To the contrary, the Trustee's pleadings and briefing to date have offered only conclusory allegations of unsubstantiated harm to CP&A that purportedly occurred in conjunction with harm Pettit inflicted upon the CP&A clients."). Trustee counters that that it has standing to bring claims for direct damages suffered by CP&A because the Court's prior ruling in ***Verstuyft*** was limited to IOLTA accounts and Trustee, here, has asserted claims "from numerous accounts— the vast majority of which are non-IOLTA." (ECF No. 72 at 2). In Trustee's view, the First Amended Complaint "explicitly alleges harm to the estate of CP&A as the result of TBOSA's wrongful acts and omissions."[6]

The Court will take the opportunity here to reiterate its prior ruling in ***Verstuyft et al. v. Wells Fargo Bank***.[7] On January 24, 2024, the Court held a hearing to address Wells Fargo's Motion to Dismiss the Trustee's Second Amended Complaint. (Adv. No. 22-50591; *see generally* ECF No. 118). The Court noted that the Armstrong plaintiffs were concerned about a statute of limitations issue and hoped to move forward in state court as opposed to relying upon the Trustee

---

ECF No. 95 at 9 (citing Ex. A at 34–75).

[6] *See, e.g.* ECF No. 33 (First Amended Complaint) at ¶¶ 1.1 (alleging that TBOSA's wrongful actions "enabled the theft of tens of millions of dollars from CP&A"); 1.3 (alleging that TBOSA actions allowed Petit "to operate a scam on CP&A" and "steal millions from CP&A"); 4.10 (alleging that TBOSA was a willing participant in the scheme of Pettit to defraud CP&A"); 4.15 (alleging that TBOSA's actions "enabled Pettit to breach his fiduciary duty to CP&A); 4.36 (seeking "recovery of the harm suffered by the Estates"); 5.16 (alleging that "the Estate of CP&A suffered harm . . . as a result of Pettit's and TBOSA's conduct"); 5.23 ("CP&A . . . lost significant funds in the TBOSA Accounts" and therefore "suffered financial damages in an amount to be determined at trial"); 5.28 (alleging that CP&A "lost significant funds entrusted to CP&A"); 5.34 (the "CP&A Estate has suffered financial damages.").
[7] Adv. No. 23-05039-CAG.

make a collection for all parties. (*Id.* at 11, lns. 1–9). Trustee, in the ***Verstuyft*** case, argued with the Armstrong plaintiffs over who was entitled to the ownership of a New Mexico IOLTA account and the Beyer Living Trust, which were allegedly comingled. Both parties wanted ownership over those claims.

During this hearing, the Court noted both parties' positions: the Trustee argued that (1) there was a mix of non-estate and estate claims which were so comingled that it was impossible to determine who owned what claim, and (2) that these claims were not direct claims. Conversely, the Armstrong plaintiffs argued that they had exclusive authority and control over their own funds that they had placed into IOLTA accounts. To clarify, the question for the Court was, "under Fifth Circuit precedent, who was the party who was harmed?" The Court began by explaining its view that IOLTA accounts as "sacred," and when funds are placed into those specific accounts, *the client* ultimately owns the money placed into that account. (*Id.* at 13, lns. 1–4) (emphasis added). The Court held that the harmed party was ultimately the Armstrong plaintiffs, because as the account beneficiaries, they were ultimately the people who had invested their money into the trust and were harmed.

Procedurally, at the end of the Court's decision, the Court further explained that the Armstrong plaintiffs were then permitted to pursue their breach of fiduciary duty claims against the banks in another forum. Central to this Court's consideration surrounding ownership of the claims was the fact that the Armstrong plaintiffs could (1) continue to pursue their claims for relief (and the Trustee could also pursue the remaining claims in this Court), and (2) *then* the Court could elect to find that the Motion to Compel Arbitration was well-taken. The Court repeatedly went to great lengths to emphasize that its ruling was focused on IOLTA accounts only in this specific procedural posture that permitted a continued avenue for adjudication. That is not case here.

Trustee here is partially correct. As this Court previously stated, the Court's prior ruling in *Verstuyft* was narrowly tailored to finding that the IOLTA account-related claims did not belong to Trustee. The Court's prior rulings prohibit Trustee from seeking clawback of the IOLTA-related accounts—but only the IOLTA-related accounts. The Court holds that Trustee has standing in this case to seek a claim for relief addressing non-IOLTA accounts. Further, to address Defendant's claim that Trustee impermissibly "lumped" its definition of accounts to include IOLTA and non-IOLTA accounts, which was already rejected by this Court in a similar Pettit-adversary, there is no rule that the Court may not separate the claims in the Trustee's definition within the First Amended Complaint. This argument is rejected.

ii.  The Law of the Case Doctrine Does Not Apply

Defendant again relies on *Verstuyft* to claim the Trustee does not have standing but uses the veneer of the "law of the case doctrine" as its procedural vehicle to do so. Defendant argues that the common law claims are barred by the law of the case doctrine because the "instant case fits perfectly within the doctrine's intended framework . . . Trustee's knowing participation in breach of fiduciary duty, knowing participation in perpetration of fraud, and negligence claims against the Bank in this case are the same causes of action this Court previously dismissed against Wells Fargo." (ECF No. 50 at 19–20). Defendant claims that the Court's prior order in *Verstuyft* dismissed Trustee's common law claims as to "all other funds . . . deposited by or on behalf of CP&A clients or 1031 Exchange parties" but concedes that Trustee's First Amended Complaint does not identify any specific amount of alleged estate property. (ECF No. 50 at 20). Defendant argues that the "Court correctly dismissed identical claims against Wells Fargo in *Verstuyft* despite Trustee's complaint in that case having a considerably greater quantity and quality of factual allegations." (ECF No. 50 at 21).

Trustee counters that its claims in ***Verstuyft*** were not "based on identical or substantially similar facts as the claims here." (ECF No. 72 at 10–11). Trustee notes the Court's rulings in ***Verstuyft*** were limited "specifically to claims related to IOLTA accounts" and that the "Court made this point repeatedly." (ECF No. 72 at 11).[8] Trustee further distinguishes the ***Verstuyft*** facts from the case at bar, noting that the Court did not dismiss Trustee's claims for the funds but instead referred the claims to arbitration, and that Trustee included nine non-IOLTA accounts in its First Amended Complaint. (ECF No. 72 at 12).

"The law-of-the-case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case.'" ***Med. Ctr. Pharmacy v. Holder***, 634 F.3d 830 (5th Cir. 2011) (quoting ***Arizona v. California***, 460 U.S. 605, 618 (1983)); ***Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.***, 272 F.3d 276, 279 (5th Cir. 2001) ( "[U]nlike res judicata, the law of the case doctrine applies only to issues that were actually decided, rather than all questions in the case that might have been decided, but were not."). The law of the case doctrine does not act as an absolute bar on re-litigation, unlike issue preclusion, but affects how the court employs its discretion rehear matters. ***Philip Servs. Corp. v. Luntz (In re Philip Servs.)***, 267 B.R. 62, 67 (Bankr. D. Del. 2001)).

In deciding the ***Verstuyft*** matter, this Court was in a preliminary posture in which it was evaluating the claims for standing. The Court found that those claims, upon request by one of the parties, should instead be adjudicated in-part through arbitration and in-part before an Article III court. In contrast to this case, there are no plaintiffs wrestling ownership of the claims from Trustee

---

[8] Defendant includes the following string cite to support its interpretation the *Verstuyft* only related to IOLTA accounts:
> *See* ECF No. 50, Ex. B at 11:21–22 ("the principal focus has been a New Mexico IOLTA account"); 12:1-3, 23-24 ("it's important to note at this juncture that we are dealing with IOLTA accounts"); 21:8-11 ("notably none of those cases dealt with the issue that's presented to this Court today, which is when you have an IOLTA account"); 29:1-6 (discussing unique attributes of an IOLTA account).

(ECF No. 72 at 11).

to bring its claims in state or district court or through a separate arbitration process. Application of the doctrine of the law of the case doctrine to this fact pattern would not only be incorrect, but would also be inequitable to the merits of Trustee's claims. This Court did not fully litigate Trustee's claims nor make findings of fact or law on the merits of non-IOLTA related claims. As a result, the Court holds that the law of the case doctrine does not apply.

### iii. Section 4.406's Operation as a Statute of Repose

Defendant argues a litany of arguments related to timeliness. Defendant first claims that Trustee is barred from bringing its common law claims pursuant to UCC Section 4.406(f), which requires a customer to discover improper transactions within one year or be precluded from recovery, and *Pettit* failed to do so. (ECF No. 50 at 21) (emphasis added). Defendant next argues that the common law claims are barred pursuant to a provision under the Account Agreement,[9] which, like Section 4.406(f), requires prompt reporting of alleged errors and fraudulent transactions. (ECF No. 50 at 22–23). Finally, Defendant argues that Trustee improperly complains "of authorized transactions that are not actionable." (ECF No. 50 at 24).

---

[9] The Account Agreement states:

> Your Duty to Report Other Errors. In addition to your duty to review your statements for unauthorized signatures, alterations and forgeries, you agree to examine your statement with reasonable promptness for any other error—such as an encoding error. In addition, if you receive or we make available either your items or images of your items, you must examine them for any unauthorized or missing indorsements or any other problems. You agree that the time you have to examine your statement and items and report to us will depend on the circumstances. However, this time period shall not exceed 60 days. Failure to examine statement and items and report any errors to use within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for any errors on items identified in that statement and as between you and us the loss will be entirely yours.

Ex. E, Account Agreement, at 6 (emphasis added).

As an initial remark, if the Court were to agree with Defendant, doing so would create an intriguing result. Under Defendant's theory, fraudsters have the burden under the UCC, as adopted by Texas law, to report their own fraud or else bankruptcy trustees are out of luck to prosecute banks for their own alleged complicity with the fraudster. If the Court agreed with Defendant, then the Court risks potentially absolving future financial institutions from colluding with white collar crime—so long as the individual, account-holding fraudster does not report their own fraudulent signature. This cannot be.

Turning to Defendant's first argument, Defendant argues that UCC Section 4.406 operates as a statute of repose after one year. (ECF No. 95 at 14). In its Supplemental Brief, Defendant clarified its Motion to Dismiss, explaining that Pettit was "obligated to monitor and timely report unauthorized items and transactions under Section 4.406 but failed to do [so]." (ECF No. 95 at 16). In its Motion to Dismiss, Defendant explains how it believes that the UCC applies: the UCC allegedly preempts Trustee's common law claims because "the complained of acts or omissions arise out of transactions governed by TEX. BUS & COM. CODE § 4.406" (ECF No. 95 at 14), "Article 4 of the Uniform Commercial Code ("UCC"), found in Texas Business Commerce Code Chapter 4, is the governing body for bank deposits and collections" (ECF No. 50 at 21), and the "funds transfers" are governed by Article 4A of the UCC. (ECF No. 50 at 22, n.6). Defendant claims that this Court finding no preemption or preclusion would somehow impose "liability inconsistent with the UCC." (ECF No. 95 at 14–15) (citing TEX. BUS. & COM. CODE ANN. §§ 4.101 *et seq.*). Defendant provides no further clarity despite additional briefing at the Court's direction.

Trustee first counters that the UCC does not apply at all, but that even if it did, applying the UCC to the facts at hand would create an untenable result. Trustee argues that the UCC does not apply because the "common law claims may exist when they do not conflict with the provisions

of the Texas Business and Commerce Code" and that there is no conflict here. (ECF No. 72 at 13). Trustee notes that Chapter 4's obligations only include the following: "certain warranty obligations on customers who deposit checks drawn on other banks . . . the right to charge back such settlements . . . [and the right to] vary the effects of its provisions by agreement." (ECF No. 72 at 13–14). In Trustee's view, none of its claims addressing alleged bank complicity with a white-collar criminal touch on any of the Chapter 4 obligations in its First Amended Complaint.

Trustee further specifies that Section 4.406(f) specifically does not apply because "none of the Trustee's claims are based on the allegation that Pettit did not authorize his signature, nor that there were any alternations on the deposit or transfer requests." (ECF No. 72 at 15). Trustee argues that Section 4.406's one-year reporting requirement fails to apply to Trustee's First Amended Complaint because Section 4.406 only contemplates issues surrounding "the customer's unauthorized signature" or "alteration of an item" but "none of Trustee's claims are based on the allegation that Pettit did not authorize his signature, nor that there were any alterations on the deposit or transfer requests." (ECF No. 72 at 15). Trustee notes that its First Amended Complaint involves Defendant's conduct surrounding the following instances:

> ¶¶ 1.1, 4.3, 4.11-4.12 (alleging TBOSA's conduct in opening the accounts for Pettit); 4.8 (alleging TBOSA's assistance in helping Pettit clear returned checks after the transactions); 4.9 (alleging TBOSA's approving Pettit's overdrafts after the fact); 4.13 (alleging TBOSA's assistance in helping Pettit cure LOC noncompliance); 4.14 (alleging TBOSA's offer to loan additional monies when line of credit had reach maximum legal limit); 4.15 (alleging TBOSA's motivations for perpetuating Pettit's conduct).

*See generally* ECF No. 33. Finally, Trustee counters that Defendant's argument "is premised on an absurdity—that Pettit should have reported his crimes and tortious activity to TBOSA." (ECF No. 72 at 13). The Court agrees with all of Trustee's counterarguments.

Under Texas law, which has adopted most provisions of the UCC verbatim, a bank may be liable for conversion under Section 4.406 of the Texas Business and Commerce Code. *See generally* TEX. BUS & COM. CODE § 4.406. This provision "requires a bank customer to discover and report his unauthorized signature on an item within a year after the item and the account statement documenting the transaction are made available to the customer." ***Am. Airlines Emps. Fed. Credit Union v. Martin***, 29 S.W.3d 86, 90 (Tex. 2000). "If the customer does not do so, he is precluded from asserting his unauthorized signature against the bank." ***Id.***

Upon review, the Court finds that the UCC does not preempt Trustee's claims. The Court reviewed Trustee's First Amended Complaint, which does include any allegations surrounding improper signature use by Pettit. Furthermore, this UCC provision in question only contemplates protecting a financial institution from a good faith customer's failure to timely report a minute error, not insulate the bank from collusion liability because a tortfeasor's failed to report its own elaborate scheme of wrongdoing. The UCC likely did not intend to create a result or Texas legal precedent in which a wrongdoers' failure to report his own fraud insulates a bank from liability when a bankruptcy trustee is asserting claims against a bank for its own complicity. As such, Defendant's argument premised on Section 4.406 fails.

### iv.    Account Agreement Exculpation Provision Does Not Bar Claims

Next, Defendant claims that Trustee does not have standing because of the account agreement that Pettit signed with Defendant. This agreement expressly states that the Bank is "not responsible for the actions of a fiduciary, including the misuse of funds" and that there is no "obligation to monitor or enforce the terms of the trust." (ECF No. 95 at 12) (citing ECF No. 50, Ex. E at 9, ¶ 29). Defendant notes that the purpose of similar fiduciary accounts clauses is to "provide prospective accountholders with the valuable option to open fiduciary accounts while

avoiding potential liability for the foreseeable risks posed by a fiduciary's mismanagement of funds." (ECF No. 95 at 12). Trustee argues that this provision does not apply because the provision only disclaims Defendant's liability for the "actions of a fiduciary *alone*" and not Defendant's "*own* tortious conduct." (ECF No. 72 at 18).

The relevant paragraph is listed in full:

> (29) **Fiduciary Accounts**. Accounts may be opened by a person acting in a fiduciary capacity. A fiduciary is someone who is appointed to act on behalf of and for the benefit of another. We are not responsible for the actions of a fiduciary, including the misuse of funds. This account may be opened and maintained by a person or persons named as a trustee under a written trust agreement, or as executors, administrators, or conservators under court orders. You understand that by merely opening such an account, we are not acting in the capacity of a trustee in connection with the trust nor do we undertake any obligation to monitor or enforce the terms of the trust or letters.

(ECF No. 50, Ex. E at 9, ¶ 29). In Texas, account agreements, such as the one here, "are governed by Section 4.406 of the Texas Business and Commerce Code." *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 964–65 (5th Cir. 2012). Section 4.406(a) provides that "a bank that sends or makes available to a customer a statement of account showing payment of items for the account shall either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid." TEX. BUS. & COM. CODE § 4.406(a). If the statement is provided to the customer, then the customer "must exercise reasonable promptness in examining the statement . . . to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized." *Id.* § 4.406(c).

This section also states:

> Without regard to care of lack of care of either the customer or the bank, a customer who does not within one year after the statement

> or items are made available to the customer . . . discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration.

*Id.* § 4.406(f). The Fifth Circuit has explained that this provision must be considered alongside Section 4.103(a), which "permits parties to alter the effect of Article 4's provisions by agreement as long as the agreement does not disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care, or limit the measure of damages for such a lack of good faith or failure by the bank." ***Jones***, 666 F.3d at 964, n.10. (citing ***Basse Truck Line, Inc. v. First State Bank***, 949 S.W.2d 17, 21 (Tex. App.—San Antonio 1997, writ denied)); Tex. Civ. Prac. & Rem. Code § 4.103(a).

As an initial consideration, the Court is skeptical as to the UCC's application to the Account Agreement because it does not involve a sale or lease of goods. The Court declines to interpret the account provision to permit a financial institution to disclaim its responsibility for failure to exercise ordinary care or lack of good faith. Considering these rules, it is apparent that Defendant cannot contract around its own alleged fraud under Section 4.103(a) of the Texas Civil Practices and Remedies Code. The Court agrees with Trustee that this exculpation provision only exculpates Defendant from Pettit's wrongdoing, but not its own alleged misconduct. Defendant's request to dismiss based on the exculpation provision in the Account Agreement is denied.

### v.    The Repeat Wrongdoer Rule is Not Implicated

Similarly, Defendant's contention that the "Repeat Wrongdoer" rule bars Trustee's claims is unavailing. As an initial remark, the Repeat Wrongdoer Rule fails to apply here because an unauthorized signature is not the crux of the alleged Defendant wrongdoing. Pursuant to Texas Business and Commerce Code § 4.406(d), the Repeat Wrongdoer Rule applies in these situations:

16

(d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed by the customer by Subsection (c), the customer is precluded from asserting against the bank:

(1) the customer's unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure; and

(2) the customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of **time**, not exceeding 30 days, in which to examine the item or statement of **account** and notify the bank.

TEX. BUS. & COM. CODE § 4.406(d). Pursuant to this rule, Trustee "may not assert an unauthorized signature against [Defendant] when a single wrongdoer makes a series of unauthorized transactions and [Plaintiff] fails to discover and report the first transaction within thirty days of the time [Defendant] provide[d] the account statement." *Jeffrey J. Glaser, MSD, P.A. v. Compass Bank, N.A.*, No. 4:09-CV-569, 2010 WL 11553080, at *6 (E.D. Tex. June 24, 2010).

The issue here is that Trustee is not asserting an unauthorized signature as the foundation of the alleged wrongdoing in the First Amended Complaint. Trustee's First Amended Complaint rests on alleged "red flags" listed below:

Pettit's activities across the accounts at TBOSA demonstrated many red flags that were known or should have been known by TBOSA, including without limitation (the "Red Flags"):
• More than 75 overdraft occurrences and more than 15 returned items across the TBOSA
Accounts, including from the IOLTA and estate management accounts (Exhibit G - TBOSA Overdraft and Returned Items);
• Payments to the TBOSA loans from the IOLTA and Estate Management accounts; and
• Teller withdrawals from the Estate Management account . . . .
There are numerous instances where TBOSA approved overdrafts on Pettit's various TBOSA trust accounts—prior to verifying if Pettit would be able to deposit enough funds to cure the defects—in an effort to avoid any alerts of Red Flags transactions that were

obviously noncompliant with TBOSA's internal procedures and federal regulations.

(ECF No. 33 at 8–9). Trustee further alleges in its Complaint that Defendant purposefully ignored that Pettit's accounts "were out of the LOC compliance margin" because Defendant's "culture financially rewarded those employees based on a number of metrics including the number of accounts opened, the amount of daily balances in those accounts, and the amount of deposits." (ECF No. 33 at 10). Trustee further contends that Defendant's Managing Director was aware that Pettit's line of credit had reached the maximum allowable balance and that he was past the collateral requirement on his line of credit. Trustee notes that Defendant's employee permitted Pettit the opportunity to cure the defect through making a $400,000 loan and "using the margin on the other trust to make up the difference," which allegedly demonstrates collusion by the bank with Pettit. (ECF No. 33 at 11). In Trustee's theory of the case, Defendant "intentionally looked the other way allowing the fraud and breach of fiduciary duty to occur with apparent impunity." (ECF No. 33 at 12). While the Court addresses the sufficiency of these allegations under Rule 9, it is apparent that there is categorically no allegation surrounding improper signature use. As such, Defendant's Motion to Dismiss on this basis is denied.

### vi. Defendant's "Actionable Transactions" Argument is Unavailing

Defendant creates what is essentially a contractual disclaimer argument under the account agreement it had with Pettit. Defendant argues it should not be "held liable for complying with an authorized account signatory's requests to complete various transactions required of the bank under its deposit agreement with the account owner." (ECF No. 50 at 24). Defendant notes that Trustee's First Amended Complaint admits Defendant acted "in accordance with the Account Agreement, which reflects the Debtors' authority to 'withdraw or transfer all or any part of the

account balance at any time.'" (ECF No. 50 at 25). Defendant argues that this Court, in *Verstuyft*, found that the Trustee "stands in the shoes of the Debtors and is bound by the Account Agreement to the same extent the Debtors would have been prepetition." (ECF No. 50 at 25).

Trustee counters that these disclaimers "do not apply here at all" because "Trustee does not allege that there is a fiduciary relationship between TBOSA and the Debtors, nor do any of his claims depend on such a relationship." (ECF No. 72 at 18). Trustee notes that its claims are "not for TBOSA's failure to monitor or enforce the terms of any underlying trust agreements themselves, but for TBOSA's knowing participation in Pettit's breach of fiduciary duty and fraud." *Id*. The Court agrees with Trustee that these fiduciary account provisions do not divest Trustee of standing, and that Trustee's Complaint was specific to allege that that Defendant committed its *own* misconduct. Defendant's Motion to Dismiss on this basis is unpersuasive.

vii.   The Economic Loss Rule Does Not Apply

Defendant argues that the economic loss rule bars all the Trustee's common law claims because Defendant and Trustee's relationship is "purely contractual." (ECF No. 50 at 27). Defendant points to Texas caselaw to demonstrate that the courts must dismiss the case as a matter of law when plaintiffs base their tort claims upon a bank's failure to investigate customer's account, verify check signatures, and violate its own internal policies and procedures around deposit account agreements. (ECF No. 50 at 27); *Frost Nat'l Bank v. Heafner*, 12 S.W.3d 104, 111 (Tex. App.—Houston [1st Dist.] 1999, pet. denied); *Henderson v. Wells Fargo Bank, N.A.*, 974 F. Supp. 2d 993, 1010–11 (N.D. Tex. 2013). Defendant notes that the economic loss rule has been "specifically extended in the context of fraud claims like those in Trustee's Amended Complaint" and that there is no duty under Texas law for banks to "not to continue to enable the fraud." (ECF

No. 50 at 27–28) (citing *Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N. A.*, 800 F. App'x 239, 248 (5th Cir. 2020)).

Trustee counters that the economic loss rule does not apply if Defendant's conduct "would give rise to liability independent of the fact that a contract exists between the parties." (ECF No. 72 at 19) (quoting *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991)). Trustee explains that "[w]hen the only loss or damage is to the subject of the contract, the plaintiff's action is ordinarily on the contract." *Id.* (citing *DeLanney*, 809 S.W.2d at 494). Trustee further notes that its First Amended Complaint alleges claims "based on duties imposed by Texas law, not on any duties created by the Account Agreement." (ECF No. 72 at 20). Trustee contends that "none" of its claims "involve TBOSA's breach of the Account Agreement, and as previously explained, involve conduct outside the scope of the Account Agreement itself[;]" thus, "giv[ing] rise to liability independent of the fact that a contract exists between the parties." *Id.*

"The application of the economic loss rule is a question of law for the court to decide." *Golden Spread Elec. Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*, 954 F.3d 804, 807 (5th Cir. 2020). Under Texas common law, the economic loss rule "precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718–19 (Tex. 2014) (per curiam); *see also LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 235 (Tex. 2014) (noting that the economic loss rule only applies to unintentional torts). The rule was created to set boundaries in product liability cases and "provide a more definite limitation on liability than foreseeability can and reflects a preference for allocating some economic risks by contract rather than by law." *Fuller*

20

*v. Le Brun*, 616 S.W.3d 31, 44 (Tex. App.—Houston [14th Dist.] 2020, pet. denied); *LAN/STV*, 435 S.W.3d at 235.

In evaluating the application of the economic loss rule, courts consider the "source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and the nature of the remedy sought by the plaintiff." *Colbert v. Wells Fargo Bank, N.A.*, 850 F. App'x 870, 876 (5th Cir. 2021) (per curiam); *James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce N.A., Inc.*, 403 S.W.3d 360, 365 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The Texas Supreme Court has explained that this analysis is a holistic endeavor, because the "application of the rule depends on an analysis of its rationales in a particular situation." *LAN/STV*, 435 S.W.3d at 244. Texas interprets this rule loosely; the economic loss rule does not bar all tort claims that coincide with a contractual dispute, because "there is not one economic loss rule broadly applicable throughout the field of torts, but rather, several more limited rules that govern recovery of economic losses in selected areas of the law." *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011) (quoting Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 WASH. & LEE L. REV. 523, 534 (2009)).

Despite being charged with a broad, factually-driven analysis, the Court recognizes that the economic loss rule does not "bar all claims arising out of a contractual setting, and a party cannot 'avoid tort liability to the world simply by entering into a contract.'" *Le Brun*, 616 S.W.3d at 44 (citing *Chapman Custom Homes, Inc.*, 445 S.W.3d at 718–19). Generally, for example, the economic loss rule "does not preclude tort claims that are independent of a contract." *Chubb Glob. Mkts. Syndicate 2488*, 2023 WL 348998, at *11 (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs. & Contractors, Inc.*, 960 S.W.2d 41, 46–47 (Tex. 1998)). The Texas Supreme Court previously noted that the economic loss rule does not preclude tort claims for "negligent

misrepresentation, legal or accounting malpractice, breach of fiduciary duty, fraud, fraudulent inducement, tortious interference with contract, nuisance, wrongful death claims related to loss of support from the decedent, business disparagement, and some statutory causes of action[.]" *Sharyland Water Supply Corp.*, 354 S.W.3d at 418–19.

As an initial matter, to reiterate, Plaintiff's claims are for (1) knowing participation in the breach of fiduciary duty, (2) knowing participation in perpetration of fraud, and (3) negligence and gross negligence. There is no caselaw directly addressing whether the economic loss rule precludes recovery for knowing participation in the breach of fiduciary duty and knowing participation in perpetration of fraud claims. Thus, the Court will look to the underlying bases of those claims—breach of fiduciary duty and fraud, which is also the underlying basis for TUFTA—as persuasive in determining how Texas courts may approach those issues. Upon review, the Court declines to read the economic loss rule to "swallow all claims between contractual and commercial strangers" and agrees with Trustee that the economic loss rule does not apply. *Sharyland Water Supply Corp.*, 354 S.W.3d at 419.

One case the Court considered in reaching its decision is *James J. Flanagan Shipping Corporation v. Del Monte Fresh Produce N.A., Inc*., in which a Texas court held that a breach of fiduciary duty claim was not precluded by the economic loss rule. 403 S.W.3d 360, 365–66 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Flanagan, a shipping corporation, contracted to stevedore to Del Monte, a produce company. *Id.* at 352. Flanagan employee Bradford provided Flanagan's proprietary information to its competitor, which led to another company outbidding Flanagan and receiving Del Monte's next contract. *Id.* Flanagan sued Del Monte for encouraging Bradford's breach of fiduciary duty. *Id.* at 364. The *Flanagan* court held that the economic loss rule did not apply in that instance because Bradford owed a fiduciary duty to Flanagan that was

"independent" from the stevedoring contract between Del Monte and Flanagan. *Id.* at 366. Here, Trustee similarly alleged that Defendant breached its duty to not participate or engage in fraud, which is an *independent duty* unspecified in this account agreement. Following similar logic surrounding independent duties, other Texas courts have expressly held that pure economic loss is recoverable in breach of fiduciary duty and fraud. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418–19 (Tex. 2011); *see, e.g.*, *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873–74 (Tex. 2010) (noting that fee forfeiture, as well as actual damages, are recoverable for breach of fiduciary duty); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex.1983) (upholding a jury's award of lost profits for fraud claim).

Accordingly, following *Ratcliff*, *Sharyland*, and *Del Monte*, the Court finds that the economic loss rule does not apply for Trustee's knowing participation in the breach of fiduciary duty claim or knowing participation in fraud claim. Furthermore, Trustee does not complain about any failure on the part of Defendant to perform its contractual obligation under the Account Agreement between Pettit and the Defendant. Rather, Trustee's claims are based on Defendant's involvement in Pettit's breach of fiduciary duty and Trustee seeks to recover funds that may be still in IOLTA accounts had Defendant not allegedly encouraged and participated in Pettit's fraud and his breach of fiduciary duty. The duty breached here—the Defendant's duty to not participate in fraudulent conduct or assist in its client's breach of fiduciary duty—did not arise from the Account Agreement. The Court now turns to the economic loss rule's application to the remaining claims of gross negligence and negligence.

In Texas, "the economic loss rule is applicable to claims for negligence, gross negligence, and other negligence-related causes of action, including negligent hiring." *A-1 Am. Fence, Inc. v. Wells Fargo Bank, N.A.*, No. 1:20-CV-441, 2021 WL 7184973, at *5 (E.D. Tex. May 5, 2021). If

a plaintiff "seeks to recover only benefit of the bargain damages based on the contractual agreement" and fails to allege any facts to support the existence of a cognizable duty independent of the defendant's contractual obligations, negligence claims will be precluded by the economic loss rule. *Id.* at *6. Here, Trustee alleges that Defendant was negligent because it permitted Debtor's misuse of client funds. *See generally* ECF No. 33. Trustee seeks "financial damages in an amount to be determined at trial." (ECF No. 33 at 31).

Texas law is clear that the burden is "on the plaintiff to establish evidence of an independent injury." *A-1 Am. Fence, Inc.*, 2021 WL 7184973, at *5; *Wansey v. Hole*, 379 S.W.3d 246, 248 (Tex. 2012) (noting that the burden to present evidence of harm that is not purely economic lies with the plaintiff). As the only alleged damages are "to be determine at trial" in a monetary amount, Trustee has failed satisfy its burden. Thus, the economic loss rule bars Trustee's gross negligence and negligence claims and there is no standing for these claims. The remaining standing arguments will only pertain the remaining fraud-based common law claims.

### viii. *In Pari Delicto* Does Not Apply at the 12(b)(6) Pleading Stage

Defendant further argues that the common law claims are barred by the principle of *in pari delicto* because a party is not permitted to assert an action based upon that party's own criminal conduct. Defendant notes that, in this instance, Trustee asserts common law claims on behalf of CP&A, Pettit's law firm. (ECF No. 50 at 28). Defendant cites to *Seven Seas Petroleum Inc. v. CIBC Markets Corp.* to demonstrate that *in pari delicto* bars a trustee's claims when the defendant aided and abetted Seven Seas' breach of fiduciary duty because Seven Seas "played a role in the alleged breach." No. 08-3048, 2013 WL 3803966, at *12 (S.D. Tex. July 19, 2023); (ECF No. 50 at 29). Defendant further cites to the Second Circuit's decision in *Picard v. JPMorgan Chase & Co., et al. (In re Bernard L. Madoff Investment Securities)* as especially "instructive" because it

24

stands for the proposition that *in pari delicito* bars claims when the underlying fraud was a "wrongdoing in which Madoff . . . participated." 721 F.3d 54, 58 (2d Cir. 2013). Defendant notes that, here, Trustee stands in the shoes of CP&A and seeks to improperly recover damages "resulting from CP&A's wrongdoing." (ECF No. 50 at 30).

Trustee counters that Fifth Circuit precedent has held that *in pari delicto* may not be applied at the 12(b)(6) stage of litigation because of its factually intensive nature under Texas law. (ECF No. 72 at 3). Trustee notes that "almost every court that has addressed the issue under Texas law at the motion to dismiss stage has refused to dismiss claims based on the doctrine. (ECF No. 72 at 22). Trustee provided the following string cite to support this claim:

> *See, e.g. Floyd v. CIBC World Mkts., Inc.*, 426 B.R. 622, 642–43 (Bankr. S.D. Tex. 2009) (holding that the "policy analysis required by Lewis cannot appropriately be made prior to discovery," thus the court was "unable to rule as a matter of law" that *in pari delicto* applies); *In re Destiny, Inc.*, 388 B.R. 737, 749 (Bankr. S.D. Tex. 2008) ("Prior to an evidentiary hearing in which the Court can consider how the particular facts and equities of this case influence *in pari delicto*, the Court cannot dismiss the Trustee's claims under Rule 12(b)(6)."); *In re TOCFHBI, Inc.*, 413 B.R. 523, 537 (Bankr. N.D. Tex. 2009) (denying summary judgement based on *in pari delicto* because "such a policy analysis cannot be undertaken based on" the summary judgment evidence.).

*Id.*

In Texas, *in pari delicto* is "an equitable defense" that has been referred to as the "unlawful acts" rule. *Mims v. Matrix Trust Co., et al. (In re Vantage Benefits Administrators, Inc.)*, No. 18-31351, 2021 WL 1815065, at *13 (Bankr. N.D. Tex. May 5, 2021). *In pari delicto*, meaning "equal fault," is "based on the common law notion that a plaintiff's recovery may be barred by his own wrongful conduct." *Howard v. Fidelity and Deposit Co. of Maryland (In re Royale Airlines, Inc.)*, 98 F.3d 852, 855 (5th Cir. 1996). Essentially, "courts should not lend their good offices to mediating disputes among wrongdoers; and [] denying judicial relief to an admitted wrongdoer is

an effective means of deterring illegality." ***Milbank, Jr. v. Holmes, et. al (In re TOCFHBI, Inc.)***, 413 B.R. 523, 536 (Bankr. N.D. Tex. 2009).

 To assert a claim for *in pari delicto*, facts supporting the *in pari delicto* defense must be "within the four corners of the Trustee's complaint." ***Hill v. Day, et al. (In re Today's Destiny, Inc.)***, 388 B.R. 737, 749 (Bankr. S.D. Tex. 2008). For this to be satisfied, the Trustee's complaint must affirmatively state that CP&A was "engaged in illegal conduct." ***Id.*** at 749. The Court must then evaluate this defense against "how the facts and equities of the individual case interact with the policy *in pari delicto* was designed to serve." ***Lewis v. Davis***, 199 S.W.2d 146, 151 (1947). This scrutiny is heightened when a defendant is using this defense against a Trustee seeking "recovery for the benefit of creditors of a wrongdoer rather the wrongdoer himself." ***In re Today's Destiny***, 388 B.R. at 749.

 Fifth Circuit has not ruled as to the whether the defense of *in pari delicto* may bar a bankruptcy trustee's claims. ***Id.*** Despite this, "[s]ome courts have found that the defense may be asserted against a bankruptcy trustee, as he stands in the shoes of a debtor who may have, through its officers and directors, perpetrated bad acts." ***In re TOCFHBI***, 413 B.R. at 537. Other Texas bankruptcy courts have noted that even if a party is *in pari delicto*, relief may be granted "if public policy demands it." ***In re Today's Destiny***, 388 B.R. at 748 (quoting ***Lewis***, 199 S.W.2d at 151). In opposition, numerous Texas bankruptcy courts have refused to permit the defense against a Trustee based on the Fifth Circuit's decision in ***Jones v. Wells Fargo***, which addresses *in pari delicto* against a receiver.

 The Southern District of Texas has ruled on an *in pari delicto* defense in the context of a motion to dismiss against a chapter 7 trustee. Judge Isgur found, after an evidentiary hearing evaluating the particular facts and equities of the case, that the Court could not dismiss the

Trustee's claim under Rule 12(b)(6). *In re Today's Destiny*, 338 B.R. at 748–50. Judge Isgur noted

that "in the bankruptcy context, the Trustee's standing is a claim *ownership* issue . . . [i]n the Fifth

Circuit and the majority of circuits, *in pari delicto* operates as an affirmative defense to a claim's

*merits* but cannot independently preclude a Trustee's standing to bring a claim." *Id.* at 747. This is

because "the questions of whether a party has standing and whether the party's claims are barred

by an equitable defense are separate questions." *Id.* (citing *Smith v. Woodforest Nat. Bank, et al.*

*(In re IFS Fin. Corp.)*, No. 02-39553, 2007 WL 1308321, at *2 (Bankr. S.D. Tex. May 3, 2007)).

Other Texas Bankruptcy courts are even more hesitant. Even at the summary judgment

stage, the Bankruptcy Court for the Northern District of Texas refused to grant Plaintiff's motions

for summary judgment against the Trustee on the basis of *in pari delicto* because:

> even if the *in pari delicto doctrine* is available to use against a bankruptcy trustee, it is not a basis to grant a summary judgment . . . because such defense is intensely factual . . . [and] [t]he Texas Supreme Court, in the case of *Lewis v. Davis*, indicated that courts should, when presented with this defense, 'consider how the facts and equities of the individual case interact with the policy *in pari delicto* was designed to serve.'

*In re TOCFHBI, Inc.*, 413 B.R. at 537.

In *In re Vantage Benefits Administrators, Inc.*, the bankruptcy court for the Northern

District of Texas hesitantly noted that "[w]hile the *Jones v. Wells Fargo* case dealt with a

receivership and would seem, at first blush, to be quite analogous to the situation of a bankruptcy

trustee, it is not at all clear that the Fifth Circuit would rule the same way in connection with a

bankruptcy case." No. 18-31351, 2021 WL 1815065, at *14 (Bankr. N.D. Tex. May 5, 2021). The

Fifth Circuit noted that "such a situation might be different because of section 541(a) of the

Bankruptcy Code, which limits the debtor estate to interests of the debtor 'as of the commencement

of the case.'" *Id.* (citing *Jones*, 666 F.3d at 967). Further, several other circuit courts[10] have applied *in pari delicto* to bankruptcy trustees, so there may be little reason to find that the Fifth Circuit would disagree. Nonetheless, the Bankruptcy Court for the Northern District of Texas recognized the Texas Supreme Court's statement in *Lewis v. Davis*, which noted that even when parties are *in pari delicto*, "relief from the doctrine will sometimes be granted if public policy or the equities demand it." *In re Vantage Benefits*, 2021 WL 1815065, at \*14.

Based on the above, the Court finds that such a policy analysis cannot be undertaken based on the 12(b)(6) motion provided to this Court. Most other Texas bankruptcy courts generally find *in pari delicto* to not be a proper basis for a 12(b)(6) motion. This Court also declined to apply the doctrine in the *Verstuyft* litigation, another Pettit adversary, on the basis that *in pari delicto* is not appropriate for the 12(b)(6) stage. (ECF No. 72, Ex. B at ¶¶ 59–64). As such, the Court declines to find that *in pari delicto* operates as a bar to Trustee's common law claims at this stage in the litigation. In sum, Trustee has standing to pursue the remaining common law claims of (1) knowing participation in breach of fiduciary duty, (2) knowing participation in perpetration of fraud. The claims related to fraudulent transfer were dismissed by joint stipulation. (ECF No. 86).

---

[10] *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1151 (11th Cir. 2006) ("If a claim of ETS would have been subject to the defense of *in pari delicto* at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense.") (citing *Grassmueck v. Am Shorthorn Ass'n.*, 402 F.3d 833, 837 (8th Cir. 2005)); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356-57 (3d Cir. 2001); *Terlecky v. Hurd (In re Dublin Sec. Inc.)*, 133 F.3d 377, 381 (6th Cir. 1997); *Sender v. Buchanan (In re Hedged–Inv. Assocs.)*, 84 F.3d 1281, 1285 (10th Cir. 1996); *Official Comm. of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158–66 (2d Cir. 2003).

> b. *F.R.C.P. 12(b)(6): Trustee Failed to Plead with the Requisite Specificity Required of the Heightened Fraud Standard Under F.R.C.P. 9(b)*

> i. <u>Trustee's Knowing Participation in Breach of Fiduciary Duty Fails</u>

Defendant first argues that Trustee's knowing participation in the breach of fiduciary duty claim—as well as its knowing participation in the perpetration of fraud claim—are "relabeled claims for 'aiding and abetting,' which is a cause of action that the Fifth Circuit has held does not exist in Texas." (ECF No. 50 at 30) (citing ***Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N.A.***, 800 F. App'x 239, 249 (5th Cir. 2020) ("[T]he Texas Supreme Court has not expressly decided whether Texas recognizes a cause of action for aiding and abetting, and . . . a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts.")).

This Court previously rejected the argument that knowing participation in breach of fiduciary duty is an impermissible "aiding and abetting." (ECF No. 72, Ex. B at 68:18–20). In the ***Verstuyft*** litigation, the Court explained that there is some confusion as to whether this cause of action exists in Texas,[11] considering that the Texas Supreme Court has not spoken on the issue.[12] Even so, multiple Texas courts have recognized claims for aiding and abetting breach of fiduciary duty. *See, e.g.*, ***Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP***, No. 3:12-CV-4641, 2014 WL 12572881, at *8 (N.D. Tex. Dec. 17, 2014); ***C.W. v. Zirus***, No. SA-10-CV-1044, 2012 WL 3776978, at *8 (W.D. Tex. Aug. 29, 2012); ***Woloshen v. State Farm Lloyds***, No. CIVA3:08CV0634, 2008 WL 4133386, at *3 (N.D. Tex. Sept. 2, 2008); ***Floyd v. Hefner***, 556 F. Supp. 2d 617, 654–55 (S.D. Tex. 2008). There is no binding caselaw on this issue, but the Court

---

[11] *Compare* **Floyd v. Hefner**, 556 F. Supp. 2d 617, 654–55 (S.D. Tex. 2008) (recognizing aiding and abetting breach of fiduciary duty claim), *with* **O'Kane v. Coleman**, No. 14-06-00657, 2008 WL 2579832, at *5 (Tex. App.—Houston [14th Dist.] July 1, 2008, no pet.) (finding a lack of authority to support the existence of an aiding and abetting claim).
[12] **Juhl v. Airington**, 936 S.W.2d 640 (Tex. 1996).

will again align itself with other Texas courts that recognize aiding and abetting breach of fiduciary duty claims and rejects Defendant's argument to the contrary, as it previously did in ***Verstuyft***. Accordingly, Defendant's argument fails.

In Texas, a plaintiff pleads a knowing participation in the breach of fiduciary duty claim by demonstrating the following elements: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." ***Meadows v. Hartford Life Ins. Co.***, 492 F.3d 634, 639 (5th Cir. 2007) (citing ***Cox Tex. Newspapers, L.P. v. Wootten***, 59 S.W.3d 717, 721–22 (Tex. App.—Austin 2001, pet. denied)). Trustee responds to Defendant's Rule 12(b)(6) motion by stating that that it has provided sufficient facts for each of the three elements of its claim: that there was a fiduciary relationship between Pettit and CP&A, that Defendant knew of the fiduciary relationship between Pettit and CP&A, and the Bank was aware that it was participating in Pettit's breach of his fiduciary duty to CP&A. (ECF No. 72 at 25). The Court will address the sufficiency of each factual element below.

*1.*  A Fiduciary Relationship Exists Between Pettit and CP&A

Trustee argues that its First Amended Complaint repeatedly alleges that Pettit was an officer of CP&A, and CP&A and Pettit were both previously identified Pettit as the President of CP&A and as an "officer, director, or managing executive of a corporation" in the underlying bankruptcy schedules. (ECF No. 72 at 50) (citing ECF No. 33 at ¶¶ 5.5, 5.6, 5.13). Thus, Trustee sufficiently alleged that Pettit, as an officer or director of CP&A under Texas law, owed a fiduciary duty to the corporation. (ECF No. 72 at 27) (citing ***S&S Food Corp. v. Sherali (In re Sherali)***, 490 B.R.104, 123 (Bankr. N.D. Tex. 2013) ("Under Texas law, an officer or director of a corporation owes a fiduciary duty to the corporation.")). Defendant argues that Trustee's allegation

is "conclusory" and "an example of 'legal conclusions masquerading as factual conclusions [that] will not suffice to prevent a motion to dismiss.'" (ECF No. 50 at 31) (citing *Blackburn v. City of Marshall*, 42 F. 925, 931 (5th Cir. 1995)). The Court disagrees. Trustee's citation to *In re Sherali* is well-founded, and Texas law overwhelmingly holds that officers and directors of corporations owe fiduciary duty to that corporation which require officers to act only in good faith and in the best interest of the corporation. *Jackson, et al. v. Jackson (In re Jackson)*, 141 B.R. 909, 915 (Bankr. N.D. Tex. 1992); *Hughes v. Houston Nw. Med. Ctr., Inc.*, 680 S.W.2d 838, 843 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). As such, the first element is satisfied.

### 2. Defendant Knew of this Fiduciary Relationship

Trustee also argues that the First Amended Complaint sufficiently alleges that the Bank knew of the fiduciary relationship between Pettit and CP&A because Defendant had "access to CP&A's case list and knew of the insurance payments coming in on CP&A's settlements." (ECF No. 72 at 28) (citing ECF No. 33 at ¶ 5.13). Trustee notes that other Texas courts have found "similar, or even less detailed, allegations sufficient to meet the second element."[13] (ECF No. 72 at 28). Defendant counters that "abstract awareness of a fiduciary duty owed to an unspecified third party is not enough to satisfy the third element" and a plaintiff must "plead actual knowledge

---

[13] Trustee provided the following citations as a string citation in its Response:
> *TIGI Linea Corp. v. Prof'l Prods. Grp., LLC*, No. 4:20-cv-087, 2020 WL 73446741, at *5 (E.D. Tex. Nov. 16, 2020) (holding that allegations that the defendant "knew that Davis was [a] [] manager of TIGI, and therefore knew that Davis owed TIGI those fiduciary duties" was sufficient to satisfy the second element of a knowing participation claim); *Hill, et al. v. New Concept Energy, et al.* (*In re Yazoo Pipeline Co., L.P.*), 448 B.R. 163, 182 (Bankr. S.D. Tex. 2011), order vacated in part on reconsideration, 459 B.R. 636 (Bankr. S.D. Tex. 2011) (holding that second element was satisfied by the allegation that defendants "knew that Cheatam was the Debtors' owner," thus it was "plausible [that defendants] had knowledge of Cheatam's fiduciary duties to the Debtors); *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641, 2014 WL 12572881, at *8 ((N.D. Tex. Dec. 17, 2014) (holding that plaintiffs satisfied the second element by pleading defendants "knew that the Stanford Financial directors and officers owed fiduciary duties to their respective Stanford Financial companies.").
(ECF No. 72 at 28).

of a specific fiduciary duty and the details thereof to survive a motion to dismiss." (ECF No. 50 at 33–34).

Trustee's allegation is sufficient as to this element because other Texas federal courts interpreting the second element of a knowing participation claim have found "the basic rule that officers and directors owe fiduciary duties to their companies" and an "alleged familiarity" with the businesses to be sufficient. ***Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP***, No. 3:12-CV-4641, 2014 WL 12572881, at *9 (N.D. Tex. Dec. 17, 2014). Trustee alleged Defendant knew Pettit was a lawyer and had access to CP&A's settlements, so Trustee's allegation is sufficient as to this element.

### 3. Trustee Provided Insufficient Factual Allegations to Demonstrate Defendant's Awareness of its Alleged Participation in Pettit's Breach

Trustee next argues that its First Amended Complaint satisfies the third element: that Defendant was aware of its participation in Pettit's breach of fiduciary duty. Trustee alleged that Defendant "logged [Pettit's] account activity," "observed in real time that Pettit was misusing the TBOSA accounts to opera[te] a scam on CP&A," "instructed Pettit on ways to disguise reportable events or work arounds," approved overdrafts "without verifying whether Pettit would be able to deposit enough funds to cure the defects," "assisted Pettit in remedying" out of compliance accounts, and offered Pettit a $400,000 loan to cure the defects. (ECF No. 72 at 31) (citing ECF No. 33 at ¶¶ 1.3–5.14). Trustee cites to ***Hill v. New Energy Concept Inc., et al. (In re Yazoo Pipeline Co., L.P.)***[14]—which was vacated in part on reconsideration—and ***Official Stanford***

---

[14] ***In re Yazoo Pipeline Co., L.P.***, 448 B.R. 163, 182 (Bankr. S.D. Tex. 2011), *vacated in part*, 459 B.R. 636 (Bankr. S.D. Tex. 2011). Trustee cites to the original opinion that had been vacated in part without including the case history or qualifying the case history.

*Investors Communications v. Greenberg Traurig, LLP*,[15] to demonstrate that satisfaction of this element is a comparatively low bar—merely creating the possibility for a fiduciary to benefit from wrongdoing and consistently flagging unscrupulous wrongdoing by a fiduciary is sufficient. Upon reconsideration, the *In re Yazoo* court stated that the plaintiffs failed to state a claim for aiding and abetting a breach of fiduciary duty based on usurping corporate opportunities. 459 B.R. at 656. In another case, *Official Stanford Investors Communications*, the Court held that the plaintiffs adequately plead that the defendant knew of its participation in the underlying breach through conducting operations that were "consistently flagged as unscrupulous." 2014 WL 12572881, at *9. These "unscrupulous" operations led the court to make a "reasonable inference" arose that the defendant knew of others' breach of fiduciary duty. *Id.*

Defendant counters that Trustee's allegations of Pettit's unusual banking activity and "red flags" amount to mere "speculation" that is insufficient to satisfy pleading the third element. (ECF No. 50 at 26). Defendant provides a litany of cases—all outside of Texas—to demonstrate that courts have broadly rejected the position that allegations of constructive knowledge of malfeasance, imputed by "red flags" in an account owner's activity, satisfy the actual knowledge component of a knowing participation in the breach of fiduciary duty claim. (ECF No. 50 at 35–36).[16] Despite Trustee's citation to *Official Stanford Investors Communications*, in this Court's

---

[15] *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641, 2014 WL 12572881, at *9 (N.D. Tex. Dec. 17, 2014).

[16] Defendant cites to the following cases, outside of Texas, to demonstrate that this Court should adopt a similarly high pleading threshold for actual knowledge:

> *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014) (holding that allegations regarding "a multitude of atypical transactions and procedural oddities" did not raise a plausible inference of actual knowledge); *Paskenta Band of Nomlaki Indians v. Umpqua Bank*, 846 F. App'x 589, 590 (9th Cir. 2021) (holding that actual knowledge is required and rejecting plaintiff's argument "that various irregularities required further investigation by Umpqua Bank to determine whether Paskenta employees were engaged in wrongdoing."); *Groom v. Bank of Am.*, No. 8:08-CV-2S67, 2012 WL 50250, at *3 (M.D. Fla. Jan. 9, 2012) (holding that the movement of "vast sums of money," engagement in "unusual transactions," and other red flags cannot impute knowledge of breach to the bank); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 468 (S.D.N.Y. 2008)

view, repeat unscrupulous activity equaling an inference of knowledge fails to properly satisfy Rule 9(b). Trustee has not offered anything but conclusory assertions to show that Defendant had knowledge of Pettit's scheme. Merely alleging that Defendant "should have known" based on "red flags" that Pettit was operating a scheme does not establish that Defendant knowingly permitted Pettit to engage in suspicious transactions. Knowing means *knowing*. If anything, Defendant's emails with Pettit indicate that Defendant was attempting to bring Pettit back into compliance and assist him in obtaining loans, but these factual allegations do not show that Defendant "actually knew" that something was necessarily amiss. More likely, Defendant sought to give good customer service to bring a high-value client back into banking compliance standards. The Court finds that this element is not sufficiently plead by Trustee. As such, Trustee failed to plead its knowing participation in the breach of fiduciary duty claim and this cause of action is dismissed.

### ii. The Knowing Participation in the Perpetration of Fraud Claim Fails

Trustee first argues in its First Amended Complaint that the "*Pierce* Doctrine" finds a third party liable for fraud "when such party directly benefits from the fraud of another party." (ECF No. 33 at 28). Trustee argues that Defendant's "willful blindness" is "sufficient to trigger liability for fraud under *Pierce*'s 'knowingly benefits from fraud' formula." *Id.* Trustee argues that Pettit intentionally misrepresented and omitted material facts with the use of his accounts with Defendant, and Defendant "knowingly allowed Pettit to operate his accounts at TBOSA in violation of the applicable federal regulations and in a manner that bore no reasonable resemblance to how such trust accounts should actually be used." *Id.* In the alternative, Trustee argues that even if Defendant "did not knowingly perpetrate Pettit's fraud against CP&A and the clients of CP&A,

---

(holding that "to plead the second element … a plaintiff must allege actual knowledge—allegations of constructive knowledge or recklessness are insufficient" (emphasis added)). (ECF No. 50 at 36).

TBOSA substantially benefitted from, and was *willfully* blind to, Pettit's fraud scheme" as supported through the fact that Defendant earns income from fees, uses inflows to boost deposit average metrics, and investing capital derived from 1031 exchanges. *Id.* at 29. Defendant counters that Trustee mistakes the rule and the context of ***Pierce v. Fort***, 60 Tex. 464, 470 (1883).

Upon review, the Court is not convinced that the "Pierce Doctrine" exists. There appears to be no modern caselaw addressing such a doctrine and the case itself from hundreds of years ago does not contemplate the fact pattern at issue. For emphasis, *Pierce* dates to the 19th century and has only 34 citations in the case's history upon search. In ***Pierce***, the Texas Supreme Court addressed a woman who was fraudulently induced into transferring her land by her husband and a man named Wright, finding that her husband was an accomplice to the fraud. *Id.* at 470. The Court determined that Wright could also be held liable as though he were her husband because he was an accomplice to the fraud. *Id.* The ***Pierce*** case, and argument, is inapplicable to the facts at hand. There is no caselaw in Texas in which this ***Pierce*** case has been used to state a claim for knowing participation in the perpetration of fraud. Furthermore, even if it did, Trustee has failed to state any facts with particularity to connect the dots for the Court as to how Defendant *knowingly* participated in Pettit's fraud. The Court agrees with Defendant, and this claim is dismissed.

## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss is **GRANTED** and Trustee's First Amended Complaint is also **DISMISSED WITH PREJUDICE**.

**IT IS HEREBY ADJUDGED and DECREED** that the above described is **SO ORDERED.**

# # #